THE STATE EX INF. JOEL B. NORMAN, PROSECUTING ATTORNEY OF STONE COUNTY, v. D. E. ELLIS, CLERK OF CIRCUIT COURT OF STONE COUNTY.

THE STATE EX INF. JOEL B. NORMAN, PROSECUTING ATTORNEY OF STONE COUNTY, v. JAMES HALL, CLERK OF COUNTY COURT OF STONE COUNTY.—28 S. W. (2d) 363.

Court en Banc, May 15, 1930.

*Stratton Shartel,* Attorney-General, and *L. Cunningham,* Special Assistant Attorney-General, *amicus curiae.*

156

*Rufe Scott, Tom R. Moore* and *Moore & Moore* for respondent.

WHITE, J.—These two cases were heard together. In the second case, the Prosecuting Attorney of Stone County filed information in the nature of *quo warranto,* alleging that James A. Hall, January 3, 1927, was Clerk of the County Court of Stone County, and as such had a right to name and appoint a deputy clerk, and did appoint to that office, in violation of Section 13, Article XIV, of the Constitution of Missouri, Mabel Hall, his wife, by reason whereof the said James A. Hall forfeited his office.

In the first case, the information charged D. E. Ellis, Clerk of the Circuit Court of Stone County, with a similar offense in appointing his wife, Lola Ellis, as his deputy clerk.

A writ of *quo warranto* was issued in each case, and the respondent in each case made return putting in issue only the questions of law involved in the information, contending that the amendment, Section 13, Article XIV, of the Constitution of Missouri, was not applicable because not self-executing and no statute had been enacted to put it in operation. The return further denied that the deputy clerk in each case was related to respondent within the fourth degree of consanguinity or affinity. An agreed statement of facts was filed in the Hall case. A stipulation was filed in the Ellis case, the effect of which is to make the Ellis case depend upon the ruling in the Hall case.

In the agreed statement it appears that January 13, 1926, George W. Crowder, then Assistant Attorney-General, gave an opinion upon this subject to Mr. Moody Mansur, Prosecuting Attorney of Ray County, in which Mr. Crowder held that the constitutional amendment of 1925, Section 13, Article XIV, was not self-enforcing, and that since no legislation had been enacted to make it effective it could not be enforced, citing State ex rel. v. Dearing, 253 Mo. 604. Respondent Hall presents that as showing that he was acting lawfully and in good faith in appointing his wife as deputy.

The Attorney-General in the present cases, as *amicus curiae*, presents a brief and argument contending that the Constitutional Amendment of 1925, Section 13, Article XIV, *is* self-enforcing.

I. It is first claimed that the prosecuting attorney of a county has no authority to bring a *quo warranto* proceeding against a person unlawfully holding public office, and that only the Attorney-General has such authority. Section 2066, Revised Statutes 1919, has the following provision:

"In case any person shall usurp, intrude into or unlawfully hold or execute any office or franchise, the attorney-general of the state, or any circuit or prosecuting attorney of the county in which the action is commenced, shall exhibit to the circuit court, or other court having concurrent jurisdiction therewith in civil cases, an information in the nature of a *quo warranto*. . . ."

That section places the prosecuting attorney in exactly the same position as the Attorney-General of the State. He "shall exhibit to the circuit court" of the county where the action is commenced, "or other court having concurrent jurisdiction therewith *in civil cases*."

If the proseuting attorney cannot begin such action in the Supreme Court then the Attorney-General cannot, because the two are given exactly the same authority. An action begun in the Supreme Court could not be said to be "commenced" in any county. The jurisdiction is co-extensive with the State.

What court has concurrent jurisdiction with the circuit court? Certainly none in all civil cases, but the Supreme Court and a court of appeals has concurrent jurisdiction with the circuit court in *quo warranto* proceedings. Sections 3 and 12, Article VI, of the Constitution. No statute could modify or impair the force of those sections.

Section 22, Article VI, of the Constitution gives to the circuit court *exclusive* original jurisdiction "in all civil cases *not* otherwise provided for." *Quo warranto* is otherwise provided for in Sections 3 and 12, Article VI. The Supreme Court has concurrent original jurisdiction with circuit courts in that sort of a *civil case*, and Section 2066, Revised Statutes 1919, must be construed to harmonize with the Constitution. Thus the prosecuting attorney is invested with the same authority by that section as is the Attorney-General.

The county "in which the action is commenced" is the county where other statutes provide for jurisdiction; it would certainly include the circuit court of the county where an office is unlawfully held. The expression "or other court having concurrent jurisdiction" must apply to the Supreme Court. The prosecuting attorney is given the same authority as the Attorney-General to bring the action, and Section 3, Article VI, of the Constitution applies to both. Therefore the expression "where the cause of action is commenced" must be

considered to mean in the county where the circuit court has jurisdiction of the cause.

II. It is next contended that Section 13, Article XIV, is not self-enforcing.

It was presented as an amendment by the Constitutional Convention of 1924; also at the same time Section 7 of Article XIV was presented. Both of these sections were adopted by the people as amendments to the Constitution in the election of 1924, and appeared in the Laws of 1925, page 411, as follows:

"Section 7. Laws may be enacted to provide for the removal from office, for cause, of all public officers, not otherwise provided for in this Constitution.

"Section 13. Any public officer or employee of this State or of any political subdivision thereof who shall, by virtue of said office or employment, have the right to name or appoint any person to render service to the State or to any political subdivision thereof, and who shall name or appoint to such service any relative within the fourth degree, either by consanguinity or affinity, shall thereby forfeit his or her office or employment."

The general rule is thus stated in 12 Corpus Juris, page 729:

"It is within the power of those who adopt a constitution to make some of its provisions self-executing, with the object of putting it beyond the power of the legislature to render such provisions nugatory by refusing to pass laws to carry them into effect. . . .

"Constitutional provisions are self-executing when there is a manifest intention that they should go into immediate effect, and no ancillary legislation is necessary to the enjoyment of a right given, or the enforcement of a duty imposed."

And further, page 730:

"A constitutional provision designed to remove an existing mischief should never be construed as dependent for its efficacy and operation on legislative will."

That rule was approved but not applied by this court in McGrew Coal Company v. Mellon, 287 S. W. 450, l. c. 454. The case involved Section 12, Article XII, of the Constitution which established a short-haul and a long-haul rule in regard to freight charges by a railroad company, and the section itself provides that the General Assembly shall enact remedies in addition to those already afforded by common law, more effectually to enforce such right. On its face it was not self-enforcing.

In the case upon which the respondent relies, State ex rel. v. Dearing, 253 Mo. 604, l. c. 611, this court construed Section 24, Article XII, of the Constitution providing that no railroad company should grant free passes to certain officials of the State, and further: "The acceptance of such pass or ticket, by a member of the General As-

sembly, or any such officer, shall be a forfeiture of his office." After the adoption of that amendment to the Constitution the Legislature enacted Section 4814, Revised Statutes 1909, providing that one accepting a pass under such circumstances would be guilty of a misdemeanor and be punished by fine, and the judge trying the case should adjudge the defendant had forfeited his office and declare the same vacant.

The opinion, however, seems to put the conclusion squarely upon the theory that the constitutional provision itself was not self-enforcing. That is contrary to the general rule, as mentioned above and as announced in this State in a later case, State ex inf. v. Duncan, 265 Mo. 26, l. c. 42, et seq., and in cases cited there. It was there said, l. c. 42, in relation to Section 9, Article IX:

"Indeed, the clause under discussion merely expresses a status which will instantly result from the election required to be held. Statutory language would be impotent to add aught to the Constitution's expression of this resulting status, and so the clause is self-executing. It is a provision complete in itself and needs no legislation to put it into force."

That language aptly applies to this case.

Section 13 provides that any official violating its provision ". . . shall thereby forfeit his or her office or employment."

He forfeits by the act forbidden, and therefore his act results in a status. See also State ex rel. v. Sheppard, 192 Mo. l. c. 511.

The debate in the Constitutional Convention which put forward Section 13 as an amendment to the Constitution shows that it was intended to be self-enforcing. It was assumed that no legislative act would be necessary to put it into effect. One reason why it is self-executing is because some of the very state officials affected by it should not be depended upon to put it into force. It was intended, as quoted from Corpus Juris above, to put it "beyond the power of the Legislature to render such provisions nugatory by refusing to pass laws to carry them into effect." That was clear in the debates.

No doubt that idea was prominent in the minds of the voters who adopted it. As a matter of common knowledge it was so agitated in the newspapers.

III. It is claimed, however, that Section 7, presented by the same Constitutional Convention in the same Article XIV, provides for some legislative act to put Section 13 into force. These two sections were adopted by the same Constitutional Convention, but the debates do not show that they had any connection with each other. Section 7, says:

"Laws may be enacted to provide for the removal from office, for cause, of all public officers, not otherwise provided for in this Constitution."

Section 13 pronounces a forfeiture upon the commission of the act condemned. If anything more is required, Section 3 of Article VI of the Constitution invests the Supreme Court with power to issue writs of *habeas corpus, mandamus, quo warranto*, etc. There a method *is* provided in the Constitution for removal of an officer who has forfeited his office under Section 13, and Section 7 could not apply on any theory.

IV. It is contended that the wife of Mr. Hall is not related to him by consanguinity or affinity.

Affinity is defined as a legal relationship which arises as the result of marriage . . . "between each spouse and the consanguinal relatives of the other."

That is, the husband is related by affinity to his wife's relatives in the same way that she is related to them by blood, and she is related to his relatives by affinity in the same way that he is related to them by blood.

Many cases appear in which that definition is given, but they always arise where the parties concerned are the blood relatives of one spouse on one side, and blood relatives of the other spouse on the other side. We find no case except one cited below where the question comes up between husband and wife.

2 Corpus Juris, page 378, states the old rule in relation to husband and wife: "A husband and wife are not related to each other by affinity but are regarded in law as one person."

In support of that text an old case is cited; an English case determined in 1753. The question arose on the right of a wife to a moiety of the husband's estate. A statute provided that in case any person should die intestate the ordinary should grant "administration of the goods of the person deceased *to the widow* of the said person deceased or to the next of kin."

A will was also involved, and the consideration of the will and the statute gave the Lord Chancellor an excuse to deliver himself of the dictum "the wife is no relation (to her husband) by blood nor by affinity."

The matter came up in Kelly v. Neely, 12 Ark. 657, a leading case, reported in 56 Am. Dec. 288. The question in that case was how the husband of a woman and the husband of his wife's niece were related. The relation of the husband to the wife came in only incidentally in order to figure out the relation of the parties interested. The court said, 56 Am. Dec. 1. c. 293:

"It is upon the principle of a complete merger or incorporation of the very being and existence of the wife in that of her husband, and *upon that alone*, that the relationship contended for can be conceded. The act of marriage, therefore, though creating a private relation, cannot be said, in strictness, to create any relationship either by consanguinity or affinity; because those relations presup-

pose a separate legal existence between the parties thus related, which, as we have shown, is not the case in respect to husband and wife.'' [Italics ours.]

There you have it clearly and explicitly. The reason and the only reason why a husband cannot be considered related to his wife by affinity is because his wife legally does not exist as a separate individual. At common law she could not sue without his joining in the suit; he had a right to possess and control her personal property; he could sue for possession of her real estate; upon him devolved the responsibility of protecting her legal rights.

The Married Woman's Act and its attendant incidents have changed all that. Nothing tangible remains of that original unity. The married woman is no longer a *femme covert* in all respects as was her status under the common law. Her property is separate property. She is a *femme sole* for transacting and carrying on her business on her own account; to contract and to be contracted with; to sue and be sued; to enforce and have enforced against her such judgments as may be rendered for or against her, without her husband being joined as a party. She can convey her land without her husband joining in the deed. [Brook v. Barker, 287 Mo. 13.] In Brewing Co. v. Saxy, 273 Mo. 159, involving a tenancy by the entirety, appears an interesting discussion showing the distinction between the relation of husband and wife as to such property and the common-law relation which submerged the wife into the personality of the husband. It was pointed out that in a tenancy by the entirety of land each took the whole estate. It is one estate vested in two persons. On the death of one the survivor took the whole. That is a union of *equality*, whereas the statutes emancipating married women releases them from a unity of *inequality*. The common-law union resulting from a marriage is not a union of two persons, but it is entire annihilation of one. So we find the existence of estates by entirety is inconsistent with the common-law notion of the unity of husband and wife.

In Claxton v. Pool, 197 S. W. 349, we held that a husband was not liable for his wife's torts, contrary to the common law rule. That was not because of express provisions in the acts emancipating married women, but because as incidental to those enactments and the common purposes in the relation of husband and wife she alone was responsible for her torts unless committed under his direction, actual or implied.

The court said, l. c. 352:

''Without a specific statutory enactment to that effect, she is recognized as being likewise emancipated, by the spirit and general trend of legislation, from her personal vassalage to her husband, which prevailed at common law. He has no authority to constrain her actions in the way which was once recognized as his right. In

many states, with statutes similar to ours, the courts have boldly said that the rule need not be applied, because the reason for it has ceased to exist.''

The court in a Pennsylvania case, 9 Pa. Dist. 54, decided in 1900, evaded the common law rule. A member of a fraternal order provided in his will that in case of death the benefits should go to his *fiancee*. One of the by-laws of that order provided that no certificate should be made payable to ''other than those related by ties of consanguinity and affinity.'' The court held that a *fiancee* was related by affinity. That of course was a legal relation arising on contract which on breach might give rise to a lawsuit, but it did *not* arise from marriage. It goes beyond the common law definition of relation by affinity.

The dictionary gives the common law definition and several other definitions of affinity. Among them are: ''A close agreement;'' ''relation;'' ''spiritual relation or attraction held to exist between certain persons.''

In the modern interpretation of statutes, if under Section 6632, Revised Statutes 1919, a juror, on his *voir dire* examination, should be asked if he were related by blood or marriage to either party and he should answer ''no,'' when in fact his wife was a party to the suit, would he be a competent juror? Would he be guilty of false swearing? Would a judge be competent to sit in a case where his wife is a party, on the ground that she is not related to him by affinity or consanguinity as expressed in the statute?

The entire trend of recent legislation, the recent interpretation of the relation of husband and wife, is to make them different persons, each having individual rights independent of the other; each responsible for his or her conduct, independent of the other. The old fiction of oneness in a legal sense has been entirely abrogated by the statutes and by judicial interpretation. The only reason for saying that a man is not related to his wife has disappeared. With the disappearance of the reason the thing disappears; when the reason for a rule of law fails, the rule fails. When the reason for a definition of a legal term ceases, the definition is obsolete. Since at common law the reason a man was not related to his wife was because his wife had no separate legal existence, and since under modern interpretations and modern statutes she has come into existence and at law she is as distinct and individual as he is, then the fiction of no relationship vanishes. She is related to him by affinity by reason of the engagement before the marriage, and that relationship of affinity continues after the marriage. The absurd fiction that he could not be related to her, but is related to her blood kin by marriage, disappears entirely.

It is suggested that in using common-law terms lawmakers are presumed to use them in their common-law significance, and intend to have them applied as understood at common law. There is an-

other rule superior to that, which is that the *intention* of the lawmakers and Constitution-makers must be gathered when interpreting an act or a constitutional provision. Lawmakers and the people adopting a constitutional provision have a right to put an interpretation on the words they use which meets their intention. They can define their language as they please and, if they see fit, can give a common-law phrase or word a meaning entirely contrary to its ancient usage. This the Legislature has done in Section 6632, Revised Statutes 1919, and the Constitutional Convention of 1924 and the people have done in adopting Section 13, Article XIV. The debates in the Constitutional Convention show that it was intended to apply to wives of officials, and as a matter of common knowledge the voters in 1924 so understood it.

These respondents, having the opinion of the Attorney-General upon which to proceed, are not to be blamed morally for appointing their wives as their deputies. Nevertheless they have forfeited their offices, and therefore ouster is ordered in each case. All concur, except *Ragland, C. J.,* who dissents.