John W. BUECHNER and Wayne Goode,
Plaintiffs-Appellants,

and

John D. Schneider, Plaintiff-Intervenor-
Respondent-Appellant,

v.

Christopher S. BOND, et al.,
Defendants-Respondents-Appellants.

No. 64348.

Supreme Court of Missouri,
En Banc.

Jan. 11, 1983.

Concurring Opinion Jan. 31, 1983.

Rehearings Denied Feb. 23, 1983.

Lewis C. Green, Green, Hennings & Henry, St. Louis, for plaintiffs-appellants.

John Ashcroft, Atty. Gen., Edward D. Robertson, Jr., Asst. Atty. Gen., Jefferson City, for defendants-respondents-appellants.

Gene J. Boesch, Deborah S. Grossman, Lewis, Tucker, Allen & Chubb, St. Louis, for plaintiff-intervenor-respondent-appellant.

HIGGINS, Judge.

This appeal is from a summary judgment that "total state revenues" is defined in article X, section 17(1) of the Missouri Constitution; that unspent revenue from prior fiscal year 1979–80, the 1980–81 opening balance, is a component portion of general revenue to be included in total state revenue; and that article X, section 18(b) violates the equal protection clause of the fourteenth amendment to the United States Constitution. The questions are whether such opening balance of the state budget for fiscal year 1980–81 is included in the definition of "total state revenues," and whether article X, section 18(b) is unconstitutional. The Missouri Constitution does define "total state revenues" but not so as to include the opening balance; the equal protection question is not ripe for adjudication, and therefore, not justiciable. Reversed.

State Representatives John Buechner and Wayne Goode filed the underlying action for declaratory judgment that defendants' calculation of the revenue limitation established by article X, section 18(a) of the Missouri Constitution improperly includes in the "total state revenues in fiscal year 1980–81" the opening balance for that fiscal year resulting in an unlawful increase of approximately $500 million in the revenue limit for fiscal year 1982–83. Defendants admit their calculations for the 1982–83 budget were accomplished by inclusion of the 1980–81 opening balance, and assert such calculations are as prescribed by the constitution. Plaintiffs contend that defendants, by furnishing the General Assembly with a budget calculated as admitted, make it impossible for plaintiffs and others in the General Assembly to vote rationally and accurately on revenue and appropriation bills, and that the issue thus posed between the legislative and executive departments requires resolution by the court.

The trial court permitted State Senator John Schneider to intervene as a plaintiff. He contends "total state revenues" as used in sections 18(a) and 17(1) of article X is not capable of definition and therefore void; alternatively, he agrees with plaintiffs that "total state revenues" cannot include the opening balance or unspent revenue from prior fiscal years. He also alleges that plaintiffs' interpretation of article X, section 18(a) "will probably" result in an unconstitutional expenditure of state funds in that the required refund will be paid to a single class of taxpayers.

I

■ The Hancock Amendment, article X, sections 16–24, has been the subject of litigation since its incorporation into the constitution of this state. In *Buchanan v. Kirkpatrick,* 615 S.W.2d 6 (Mo. banc 1981), this Court noted "[S]ince the amendment has already been adopted and the people have demonstrated their will, this Court's duty is not to seek to condemn the amendment, but to seek to uphold it if possible." *Id.* at 12. The rules applicable to construction of statutes are applicable to the construction of constitutional provisions; the latter are given broader construction due to their more permanent character. *Boone County Court v. State,* 631 S.W.2d 321, 325

(Mo. banc 1982). Words used in constitutional provisions must be viewed in context; their use is presumed intended, and not meaningless surplusage. *Roberts v. McNary,* 636 S.W.2d 332, 335 (Mo. banc 1982). The words used in constitutional provisions are interpreted so as to give effect to their plain, ordinary and natural meaning. *Boone County,* 631 S.W.2d at 324; *State ex Inf. Danforth v. Cason,* 507 S.W.2d 405, 408 (Mo. banc 1973). The plain, ordinary, and natural meaning of words is that meaning which the people commonly understood the words to have when the provision was adopted. *Boone County,* 631 S.W.2d at 324; *Cason,* 507 S.W.2d at 408. The commonly understood meaning of words is derived from the dictionary. *Boone County* 631 S.W.2d at 324.

■ "Total state revenues," as used in article X, sections 16 through 24 of the Missouri Constitution:

> [I]ncludes all general and special revenues, license and fees, excluding federal funds, as defined in the budget message of the governor for fiscal year 1980–1981. Total state revenues shall exclude the amount of any credits based on actual tax liabilities or the imputed tax components of rental payments, but shall include the amount of any credits not related to actual tax liabilities.

Mo. Const. art. X, § 17. Every word in a constitutional provision is presumed to have effect and meaning. *McNary,* 636 S.W.2d at 335. The word "revenue" is not defined in any of these sections; therefore, it will be accorded its plain, ordinary, and natural meaning as found in the dictionary. "Revenue" is defined as "the annual or periodical yield of taxes, excises, customs, duties, and other sources of income that a nation, state, or municipality collects and receives into the treasury for public use...." Webster's Third New International Dictionary 1942 (1964).

■ The language in article X, section 17, refers to the Governor's budget message for fiscal year 1980–81 when defining the elements of "total state revenues." The Governor's budget message indicates the percentage each available state asset contributes to the total budget requirement. Ninety-three percent of the 1980–81 budget was funded by revenues generated in 1980–81; seven percent was funded by unspent revenues from prior years, or the opening balance. The opening balance is included as an element of general revenue available for expenditure in that year. Thus, the opening balance is available as an asset along with anticipated new revenue which may be expended by the state in fiscal year 1980–81. It does not characterize the opening balance as revenue for fiscal year 1980–81. Revenue is that amount generated in a given fiscal year. *See* Webster's Third New International Dictionary 1942 (1964); *see also* Black's Law Dictionary 1158 (rev. 5th ed. 1979). The plain and ordinary meaning and use of the word in its context dictates that revenue for fiscal year 1980–81 is that which is generated in fiscal year 1980–81; not revenue which was generated in prior fiscal years. The opening balance is revenue from any number of prior years which has not been spent by the state. The opening balance cannot be revenue in 1980–81; it was revenue in some previous year or years. Therefore, the opening balance cannot be included in "total state revenues" for purposes of determining the revenue limit as set out in article X, section 18.

■ The first rule of construction of a constitutional amendment is to give effect to its intent and purpose. *See City of Willow Springs v. Missouri State Librarian,* 596 S.W.2d 441, 445 (Mo. banc 1980). The intent and purpose of the Hancock Amendment is to limit state spending by restricting revenues the state may generate in any given fiscal year.

> [T]he central purpose of [the Hancock] Amendment ... is to limit taxes by establishing tax and revenue limits and expenditure limits for the state and other political subdivision which may not be exceeded without voter approval. [The] Amendment ... is popularly described as 'the tax and spending lid' amendment, words which also reflect its central purpose.

*Buchanan,* 615 S.W.2d at 13; *see also McNary,* 636 S.W.2d at 336. The objective of the amendment is accomplished only if the revenue limit is based on revenues generated for fiscal year 1980–81. Inclusion of an amount not revenue in that year artificially inflates the formula set out in article X, section 18(a),[1] and would allow the state to generate revenue in a greater proportion than that generated in 1980–81. This would defeat the intent and purpose of the amendment and cannot be permitted.

## II

Plaintiff-intervenor contends the refund provisions of the Hancock Amendment violate the equal protection clause of the United States Constitution. His argument is based on an assertion of "probability" that a refund would be necessitated in fiscal year 1983 which would unconstitutionally discriminate against certain classes of taxpayers. The trial court agreed and held section 18(b)[2] was unconstitutional for reasons expressed in the dissenting opinion in *Buchanan,* 615 S.W.2d at 26 (Morgan, J., dissenting).

▇▇▇▇ Assuming plaintiff-intervenor has standing to raise this question, the issue is not ripe for adjudication because no such refund is imminent. In order that a controversy be ripe for adjudication a "sufficient immediacy" must be established. *Nations v. Ramsey,* 387 S.W.2d 276, 279 (Mo.App. 1965). Ripeness does not exist when the question rests solely on a probability that

an event will occur. *Lake Carriers Ass'n v. McMillian,* 406 U.S. 498, 506, 92 S.Ct. 1749, 1755, 32 L.Ed.2d 257 (1972). Plaintiff-intervenor's argument is based on probability and speculation. There is currently and foreseeably no excess which would cause a refund under section 18(b).

This Court noted an argument similar to plaintiff-intervenor's in *Buchanan,* 615 S.W.2d at 6.

In oral argument there was brief discussion ... some have urged that section 18(b) relating to repayment of excess revenues hereafter collected might be violative of the equal protection and due process provisions of the U.S. Constitution. The argument is that the taxes or revenues would, for the most part, be taken from the masses (the poor) and returned to the rich who pay the income tax. We are unable to perceive how such a legal issue could arise prior to the existence of such an excess. Even then, evidence would be required to establish the degree of any alleged inequity and the reasonableness of the classification would have to be resolved.

*Id.* at 16 n. 9.

The judgment that the opening balance for fiscal year 1980–81 is a component portion of general revenue to be included in "total state revenue" and that article X, section 18(b) violated the equal protection clause of the United States Constitution is reversed; and the cause is remanded to the trial court for entry of a judgment that

1. Section 18(a) provides:

    There is hereby established a limit on the total amount of taxes which may be imposed by the general assembly in any fiscal year on the taxpayers of this state. Effective with fiscal year 1981–1982, and for each fiscal year thereafter, the general assembly shall not impose taxes of any kind which, together with all other revenues of the state, federal funds excluded, exceed the revenue limit established in this section. The revenue limit shall be calculated for each fiscal year and shall be equal to the product of the ratio of total state revenues in fiscal year 1980–1981 divided by the personal income of Missouri in calendar year 1979 multiplied by the personal income of Missouri in either the calendar year prior to the calendar year in which ap-

    propriations for the fiscal year for which the calculation is being made, or the average of personal income of Missouri in the previous three calendar years, whichever is greater. Mo. Const. art. X, § 18(a).

2. Section 18(b) provides:

    For any fiscal year in the event that total state revenues exceed the revenue limit established in this section by one percent or more, the excess revenues shall be refunded pro rata based on the liability reported on the Missouri state income tax (or its successor tax or taxes) annual returns filed following the close of such fiscal year. If the excess is less than one percent, this excess shall be transferred to the general revenue fund. Mo. Const. art. X, § 18(b).

"total state revenues" as used in article X, sections 16–24 does not include the opening balance for fiscal year 1980–81, and that the constitutional attack on article X, section 18(b) is not ripe for adjudication.

WELLIVER and DONNELLY, JJ., and SEILER, Senior Judge, concur.

RENDLEN, C.J., and GUNN and BILLINGS, JJ., dissent in separate dissenting opinions.

BLACKMAR, J., not participating because not a member of the Court when cause was submitted.

RENDLEN, Chief Justice, dissenting.

I respectfully dissent. On August 26, 1982 the trial court entered judgment in this cause declaring that the phrase "total state revenues" employed in Article 10, § 18 of the "Hancock" Amendment (1980 Amendment of the Missouri Constitution) is defined in § 17, as including (1) general revenues (2) special revenues (3) licenses (4) fees [excluding federal funds] all as "*defined in the budget message of the Governor for fiscal year 1980–1981.*" (Emphasis added.) The court found from the evidence that the definition of "total state revenues" includes unspent monies from the preceding fiscal year or the *opening balance.* This finding is consonant with the traditional budget practices of including the opening balance (i.e. the balance in the State Treasury at the beginning of fiscal year) as a component of the "total state revenues" for the base year, hence, it is a part of the "total state revenues" as that phrase appears in § 18. It is well stated by Judge Gunn in his dissent "the constitution expressly states how the term is to be defined and could not be more explicit." Ignoring the fact that the definitional section 17(1) expressly defines the broad phrase "total state revenues" the majority reach for other sources to redefine the term "revenue" in a manner not intended by the framers of the section nor the voters who set it in place.

The trial court found that the budget message for fiscal 1980–81 met the requirements of § 33.270 RSMo 1978, which prescribes the form for submission of the budget to the General Assembly. The Governor's message for that fiscal year identified "total state revenues" as the sum of "Revenue Estimate" and "Fund [opening] balance." In this connection the "budget summary" another of the pertinent documents supportive of the "message" also included "opening fund" as a part of the "total state revenues" for the fiscal year in question.

Items included in the budget message constituting revenue available for appropriation and thus part of "total state revenues" are possessed of common characteristics. They (1) must be deposited in the State Treasury and (2) may only be withdrawn by appropriation and the item "opening balance," possessed of these common characteristics and contained in the budget message, was, as found by the trial court, brought within the definition of § 17(1) as a component of "total state revenues."

In reversing the judgment and redefining the terms of § 17(1) the majority failed to follow fixed canons of construction. This Court, in *Boone County Court v. State of Missouri,* 631 S.W.2d 321, 324 (Mo.banc 1982), stated: "[r]ules applicable to constitutional construction are the same as those applied to statutory construction, except that the former are given a broader construction, due to their more permanent character. Where the language of a constitutional provision is plain and admits of but one meaning there is no room for reaching outside the provision to find other definitions. *See Rathjen v. Reorganized School District R–II,* 284 S.W.2d 516, 523 (Mo. banc 1955). Accordingly, under the scheme of the amendment the Governor's budget message is designated as the vehicle to provide or "define" the components of "total state revenues." As stated in *State ex inf. Norman v. Ellis,* 28 S.W.2d 363 (Mo. banc 1930),

[T]he people adopting a constitutional provision have a right to put an interpretation on the words they use which meets their intention. *They can define their language as they please and, if they see fit, can give a common-law phrase or*

*word a meaning entirely contrary to its ancient usage.* (Emphasis added.)

*Id.* at 367–68.

Similarly this Court in *In the Matter of the Estate of Hough,* 457 S.W.2d 687, 691 (Mo. 1970), stated:

> Further, the lawmaking body's [here the people's] own construction of its language by means of definition of the terms employed should be followed in the interpretation of the statute of which it relates and is intended to apply and *supersedes* the commonly accepted dictionary or judicial definition and is binding on the courts. (Emphasis added.)

The majority without regard for these canons plucks the term "revenue" from its place in the phrase "total state revenues" and defines it as though not a part of that phrase then compounds the problem by lifting the phrase from its position in § 17(1) and redefines the phrase as though not a part of the section. In so doing it disregards the findings of the trial court[1] and warps the meaning of the entire section. With this I cannot agree.

The trial court also properly addressed the validity question and held that the "refund provisions" of Article 10, § 18(b) are violative of the Fourteenth Amendment of the United States Constitution. I submit that the trial court was correct in its judgment for indeed the enforcement provision Article 10, § 18(b), violates the due process and equal protection of laws guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article 1, §§ 2 and 10 of the Missouri Constitution. This because the questioned section contemplates the refund of taxes only to a privileged class of taxpayers, while gathering such monies from all taxpaying citizens, including those less fortunate who pay substantial portions, if not all, of their earnings for the purchase of necessities. As noted in

a dissent to *Buchanan v. Kirkpatrick,* 615 S.W.2d 6, 17 (Mo. banc 1981), "It requires little imagination to foresee that the principal opinion's failure to deal with the problem will be interpreted as tacitly approving this invidiously discriminatory scheme, which requires dispensing of the refund monies of 'sales taxpayers' to another class of Missourians, 'income tax payers,' without the just compensation assured by Article I, § 10, Missouri Constitution." Such was described in the dissent of Morgan, J. as "the glaring presence of an *unconstitutional* classification." *Id.* at 28. The majority in the case at bar is again unwilling to deal with this problem of facial unconstitutionality because there is no imminent possibility of a refund under § 18(b). This in my view misses the point because the entire scheme is predicated upon the enforcement and refund provisions (18b) which are patently invalid and as such legitimately command our attention. The issue is ripe for decision. For these reasons, I would affirm the judgment of the trial court.

GUNN, Judge, dissenting.

I firmly believe that the definition of "total state revenues" absolutely includes the 1980–81 balance of approximately $500 million.

The majority opinion vividly indites the venerable precepts that "[w]ords used in constitutional provisions must be used in context; their use is presumed intended, and not meaningless surplusage.... The words used in constitutional provisions are interpreted so as to give effect to their plain, ordinary and natural meaning." Citing *Roberts v. McNary,* 636 S.W.2d 332, 335 (Mo. banc 1982) and *Boone County Court v. State,* 631 S.W.2d 321, 324 (Mo. banc 1982).

And so it is that the only definition of "total state revenues," as it applies to the

---

1. The trial court noted that for present purposes the "Hancock Amendment" is the same as the "Michigan Headlee Amendment." The Michigan Governor's budget message showed that in Michigan "beginning balance" is included in the total state revenue, that this is persuasive evidence of the fact that "fund balance" should be included in the total state revenues in Missouri. The court further noted that the definition of the term "fund balance" means the same as "prior appropriated funds which were unspent at the end of the fiscal year."

Hancock Amendment, appears in Art. X, § 17(1) to include "all general and special revenues . . . *as defined in the budget message of the governor for fiscal year 1980–81.*" (Emphasis added) The Constitution expressly states how the term is to be defined and could not be more explicit. It states in words that are unambiguous and that require no construction that revenue means what the governor said it meant in his budget message for fiscal year 1981.

Nowhere else in the Hancock Amendment does "total state revenues" pertain except as to Art. X, § 18(a) and (b). The effect of the majority is to ascribe a meaningless concept and purpose to the definition in Art. X, § 17(1).

The governor's budget message for fiscal year 1980–81 defined revenues to include as a component of total state revenues the opening balance of approximately $500 million that the majority opinion omits. Therefore, applying those fine principles of law recited at the outset, I am compelled to find that the trial court did not err in declaring the opening balance as a component portion of the general revenue to be included in "total state revenues" for the purposes of Art. X, § 18(a). And in this regard, I dissent from the majority opinion.

I agree that the equal protection question has not ripened for adjudication.

BILLINGS, Judge, dissenting.

I dissent because plaintiffs Buechner and Goode, as representatives, and intervenor Schneider, as senator, have no standing to prosecute this action; that as individuals and taxpayers their pleadings do not allege any injury or damage to them; and, when shorn of its wrappings, this suit is nothing more and nothing less than an effort by plaintiffs and intervenor to obtain a purely advisory opinion of this Court.

The petitions of plaintiffs and intervenor allege they are taxpayers of Missouri but the entire thrust of both pleadings is that they want guidance in connection with their legislative duties because they disagree with the defendants' interpretation of the term "total state revenues."

In *Sommer v. City of St. Louis,* 631 S.W.2d 676 (Mo.App.1982), the court considered the standing of Sommer, as an alderman and a taxpayer, to prosecute a suit for declaratory judgment which sought an adjudication that an ordinance was invalid. On the question of Sommer's standing as an alderman to maintain the suit, the court said at 679:

We consider only the issues of plaintiff Sommer's standing and plaintiff NDC's capacity to sue, for these dispose of the case. Standing is an 'antecedent to the right to relief' and has been said to be, 'in a sense, jurisdictional in limine . . . .' *State ex rel. Schneider v. Stewart,* 575 S.W.2d 904, 909[7] (Mo.App.1978). See also *Spencer's River Roads Bowling Lanes, Inc. v. Unico Management Company,* 615 S.W.2d 121, 124[5] (Mo.App.1981).

In his first amended petition, plaintiff Sommer alleged that the unconstitutionality and illegality of defendant City's acts ' . . . damage and injure plaintiff Sommer and the members of plaintiff, Metropolitan New Democratic Coalition, both as residents and taxpayers, and in plaintiff Sommer's elected capacity as Alderman, by interfering with and preventing the faithful performance of his obligations, duties and responsibilities to his constituency.' At trial, plaintiff Sommer testified that 'as a taxpayer' he had 'been at least potentially damaged . . . [b]ecause under the adoption of this ordinance certain amounts of property in the City have been off the tax rolls longer than [they] otherwise would have been.' He also testified that 'as Alderman I need a Court ruling instructing me as to what is legal for the Board of Alderman to do in terms of voting.'

An inquiry into standing presents 'the task of deciding whether a particular interest asserted is deserving of judicial protection.' Davis, 'Standing,' Administrative Law Text at § 22.04. We begin our inquiry with a brief review of plaintiff Sommer's assertion of an interest in this matter based on his status as an alderman. As an alderman, Sommer has

no judicially protectible interest in a determination of the constitutionality of a city ordinance. We find no authority conferring standing to sue on an elected official, as such, in this type of case, and Sommer cites us to none. In his capacity as alderman, he patently sought an advisory opinion, which it is not the function of the courts of this state to provide. See *State ex rel. McNary v. Stussie,* 518 S.W.2d 630, 638 (Mo. banc 1974); *Tietjens v. City of St. Louis,* 359 Mo. 439, 222 S.W.2d 70, 71[1] (1949). Alderman Sommer lacks standing to sue in this case . . . .

Next, the court of appeals reviewed the matter of Sommer's standing as a taxpayer to maintain the suit. Preparatory to ruling adversely to him on this issue the court observed at 679:

Where, as here, a plaintiff seeks to establish his standing by virtue of his status as a taxpayer of a governmental unit, he must show some injury and damage to himself in that capacity.

Here, neither in pleading nor proof have plaintiffs or intervenor demonstrated *any* standing by reason of injury or damage to maintain a suit for a declaratory judgment. To paraphrase *Sommer,* plaintiffs and intervenor, in their legislative capacities, seek an advisory opinion, which it is not the function of the courts of this state to provide.

The principal opinion finds no difficulty in determining that intervenor Schneider's contention regarding the equal protection clause is not ripe for adjudication because that contention is based on "probability and speculation." The same reasoning is applicable to the contentions advanced by petitioners Buechner and Goode. The legislature is not bound to adopt the proposed budget of the executive and is free to exercise its will in voting on appropriation and revenue matters.

In *Gershman Investment Corporation v. Danforth,* 517 S.W.2d 33 (Mo. banc 1974), this Court said at 35:

In *City of Joplin v. Jasper County,* 349 Mo. 441, 443, 161 S.W.2d 411, 412, 413, this Court speaking of the Declaratory Judgments Act (§§ 527.010–527.140, RSMo 1969), said:

'The act furnishes a particularly appropriate method for the determination of controversies relative to the construction and validity of statutes and ordinance . . . . But, when it is attempted to be so used and a judicial declaration is sought the court must be presented with a justiciable controversy—one appropriate for judicial determination—a case admitting of specific relief by way of a decree or judgment conclusive in character and determinative of the issues involved . . . . There must be a sufficiently complete state of facts presenting issues ripe for determination before a court may declare the law. *"A mere difference of opinion or disagreement or argument on a legal question affords inadequate ground for invoking the judicial power."* Borchard, Declaratory Judgments, p. 77; *State ex rel. La Follette v. Dammann,* 220 Wis. 17, 264 N.W. 627, 103 A.L.R. 1089.' (Emphasis added)

I submit that what we have here is a "mere difference of opinion or disagreement or argument" between plaintiffs and intervenor on the one hand and the defendants on the other; that under the decisional law of this state the judicial power should not be invoked in order to render an advisory opinion. In my view the case should be dismissed.

DONNELLY, Judge, concurring.

I have heretofore concurred fully in the majority opinion of Higgins, J., in the decision of this case. I do not recede in any way from such concurrence. However, I feel compelled to address certain misapprehensions created by certain of my brothers in dissent and, for such reason, file this opinion in this cause.

In a dissenting opinion filed in this cause, it was observed that the majority, by defining "revenue" in Article X, § 17(1) so as to exclude the opening balance, *"warps the* meaning of the entire section." (Emphasis mine).

The record on appeal in *Roberts v. McNary,* 636 S.W.2d 332 (Mo. banc 1982), contains a copy of a document dated October 1, 1980, and entitled "Drafters' Notes—Tax Limitation Amendment." It sought to "provide an explanation of the drafters' intent in the formulation of * * * [the Hancock Amendment]."

At page 3 of said document, the drafters addressed what is now Mo. Const. art. X, § 17, and said:

> It was the drafters' intent for the definition of "total state revenues" to be all-inclusive, including revenue from licenses and permits and any and all other sources, except those revenue sources explicitly excluded by language in the Amendment itself *and surpluses from previous fiscal years.* (Emphasis mine).

Of course, "the interpretation of this constitutional amendment is not a question of how it was understood by its framers but how it was understood by the people adopting it." *Boone County Court v. State,* 631 S.W.2d 321, 324 (Mo. banc 1982). However, to indict the majority (four judges who believe that the people intended Section 17 to mean what the drafters intended Section 17 to mean) with *warping* Section 17 hardly serves to promote "public confidence in the integrity and impartiality of the judiciary." Rule 2, Canon 2.

That observations made in dissenting opinions can yield unfortunate consequences was evidenced in *State ex rel. Sayad v. Zych,* 642 S.W.2d 907 (Mo. banc 1982). In *Sayad,* it was said in dissent: "Under today's holding * * * the Board of Aldermen for the first time will assert its influence over the St. Louis Police Board and tear away the protective abatis that was established over 120 years ago to prevent the Aldermen's intrusion upon the Police Board's authority over budgetary affairs." As an apparent result, an editorial appeared on January 28, 1983, in the St. Louis Globe-Democrat, which stated in part: "Certain House members from St. Louis, possibly feeling their oats *because the state Supreme Court has given City Hall control over the police budget,* are jockeying to

give local politicians total authority over the police department." (St. Louis Globe-Democrat January 28, 1983, at 10A, col. 1.) (Emphasis mine). Of course, both statements are grossly inaccurate. The *law of the case* appears in the principal opinion. The principal opinion reaffirmed that the Police Board is a state agency and so recognized it is subject to Hancock proscriptions. Nowhere in the principal opinion (which was carefully written so as to address and decide *only* the issue joined) is there recognition of authority in the St. Louis Board of Aldermen to affect or control the budget of the Police Board. To *speculate* beyond the Court's holding is to disserve the public interest.