MISSOURI MERCHANTS AND MAN-
UFACTURERS ASSOCIATION, et al.,
Appellants/Cross–Respondents,

v.

STATE of Missouri, et al.,
Respondents/Cross–
Appellants.

Francis E. Flotron, Jr., et al.,
Cross–Respondents,

v.

Bob Holden, Governor, et al.,
Respondents/Cross–
Appellants.

Nos. SC–83199, SC–83200.

Supreme Court of Missouri,
En Banc.

March 8, 2001.

Rehearing Denied April 24, 2001.

James C. Owen, Thomas W. McCarthy, III, Katherine S. Walsh, Chesterfield, for Appellants/Cross–Respondents.

Jeremiah W. (Jay) Nixon, Atty. General, Karen King Mitchell, Assistant Atty. General, Robert Presson, Assistant Attorney General, Peggy E. Gustafson, General Counsel, Jefferson City, for Respondents/Cross–Appellants.

James B. Deutsch, Marc H. Ellinger, Jefferson City, for Cross–Respondents.

WOLFF, J.

Various organizations and taxpayers brought actions seeking refunds under the state constitution's Hancock Amendment. These taxpayer litigants claim:

(1) the formula for computing the refunds should be altered in light of this Court's decision in *Conservation Federation of Missouri v. Hanson*, 994 S.W.2d 27 (Mo. banc 1999);

(2) total state revenues, as defined in the constitution, should include certain tax credits; and

(3) taxpayers who used tax credits to reduce their state tax liabilities should recover Hancock refunds based upon their tax liabilities before the liabilities were reduced by tax credits.

The circuit court granted relief as to (1) the change in the formula based on the *Conservation Federation* case, but denied relief as to (2) and (3) relating to tax credits.

For reasons that follow we hold:

(1) *Conservation Federation* does not require a change in the formula for calculating tax refunds;

(2) tax credits that are based on a taxpayer's liability for taxes are excluded from total state revenues, but credits not related to tax liability—refunds that exceed a taxpayer's liability—are included in total state revenues; and

(3) taxpayers who use tax credits to reduce their tax liabilities are not entitled to further Hancock refunds based upon tax liabilities that have been reduced by tax credits.

### The Parties

Missouri Merchants and Manufacturers Association, the Missouri Chamber of Commerce, Lange–Stegeman Corporation, Mark Roberts, Richard Roberts, Menlo Smith, and Mary Jean Smith are corporations and individuals that paid taxes during the period in question—1995 to 1999. The trial court certified these parties as representatives of a class of income taxpayers who claim that they are entitled to receive refunds under the Hancock Amendment "as a result of improper 'Base Year Ratio' calculations and improper calculations of tax credits in the amount of Total State Revenues." Rule 52.02(b)(1) and (2). The trial court also certified a subclass, represented by the same taxpayers, consisting of income taxpayers "who utilize tax credits in their corporate and individual tax returns as payment for their total tax liability" and claim to be entitled to receive refunds under the Hancock Amendment on their tax liabilities before their tax credits are deducted. The trial court found that the Smiths and the Rob-

ertses used tax credits and did not receive Hancock refunds for such credit amounts during the relevant period, but there is no finding that the other representative taxpayers had claims similar to those of the members of the subclass. No notice was directed to members of the class and subclass, as Rule 52.08(b)(1) and (2) do not require such notice.

Francis Flotron, Jr., Gary Marble, Associated Industries of Missouri/Taxpayers Research Institute of Missouri, and Pittsburgh Corning Corporation also brought suit seeking refunds based upon the claim that the *Conservation Federation* case requires the Hancock ratio to be recalculated to exclude the conservation sales tax. Since this claim was the same as the first claim in the case brought by the Missouri Merchants and Manufacturers Association and others, described above, the trial court consolidated the cases.

All of the parties' claims for interpretation of the Hancock Amendment are authorized by article X, section 23 of the Missouri Constitution. This Court has jurisdiction over the appeal. Mo. Const. art. V, sec. 3.

The claims are against the state and its officials, including the commissioner of administration, the director of revenue, and the state auditor.[1] The commissioner of administration is responsible for calculating total state revenues under article X, section 17(1), for calculating the revenue limit pursuant to article X, section 18, and for certifying the total amount of refunds, if any, due under the Hancock amendment.

1. Since this case was decided, the persons holding the offices of commissioner of administration and director of revenue have changed. Michael Hartmann and Carol Fischer, respectively, are substituted as parties under Rule 52.13(d). State Auditor

Claire McCaskill is named as defendant in both suits, and the governor and state treasurer are named in the Flotron action. The current governor, Bob Holden, and current treasurer, Nancy Farmer, are substituted in that case.

The director of revenue is responsible for calculating the individual taxpayer refunds and for issuing and transmitting the refund checks. The state auditor is required to "devise a system for calculating TSR [total state revenues] and the revenue limit, [and to ensure] that [the] system is enforceable against other officials." *See* *Kelly v. Hanson*, 959 S.W.2d 107, 110 (Mo. banc 1997). The current state auditor seeks reversal of the trial court's decision on the conservation tax, but, as the trial court noted, seeks "the court's guidance" on the tax credit calculation issues.

The Hancock Amendment and the Conservation Sales Tax

The Hancock Amendment, article X, sections 16 to 24, was enacted by vote of the people on November 4, 1980. As to state taxes, the amendment establishes a formula for keeping state revenues in line with the personal income of Missourians, as that relationship existed in 1980, except for taxes that are approved by a vote of the people. *Goode v. Bond,* 652 S.W.2d 98 (Mo. banc 1983).

The formula is used to calculate a limit on the total amount of taxes that may be imposed in any fiscal year. The formula specified in section 18(a) of article X states that this "revenue limit" shall "be equal to the product of the ratio of total state revenues in fiscal year 1980–1981 divided by the personal income of Missouri in calendar year 1979 multiplied by the personal income of Missouri in either the calendar year prior to the calendar year in which appropriations for the fiscal year for which the calculation is being made, or the average of personal income of Missouri in the previous three calendar years, whichever is greater." [2]

"Total state revenues" is defined to include "all general and special revenues, license and fees, excluding federal funds, *as defined in the budget message of the*

---

2. Section 18. Limitation on taxes which may be imposed by general assembly—exclusions—refund of excess revenue—adjustments authorized:

(a) There is hereby established a limit on the total amount of taxes which may be imposed by the general assembly in any fiscal year on the taxpayers of this state. Effective with fiscal year 1981–1982, and for each fiscal year thereafter, the general assembly shall not impose taxes of any kind which, together with all other revenues of the state, federal funds excluded, exceed the revenue limit established in this section. The revenue limit shall be calculated for each fiscal year and shall be equal to the product of the ratio of total state revenues in fiscal year 1980–1981 divided by the personal income of Missouri in calendar year 1979 multiplied by the personal income of Missouri in either the calendar year prior to the calendar year in which appropriations for the fiscal year for which the calculation is being made, or the average of personal income of Missouri in the previous three calendar years, whichever is greater.

Expressed as a formula, the Hancock calculations, using fiscal year 1998 as an example, are:

$$\frac{\text{Fiscal Year 1981 TSR}}{\text{CY1979 MPI}} \times \text{CY 1996 MPI} = \text{Revenue Limit}$$

Or

$$1998 \text{ TSR} - \left[\frac{\text{FY 1981 TSR}}{\text{CY 1979 MPI}} \times \text{CY 1996 MPI}\right] = \text{Excess Revenue}$$

TSR = Total state revenues
MPI = Personal income of Missouri
CY = Calendar year

Calendar year 1996 is the year prior to the calendar year in which appropriations for fiscal year 1998 are made. The MPI for calendar year 1996 apparently was greater than the average of the three calendar years prior to the appropriations year.

The portion of the formula that is the "base year ratio" is:

$$\frac{\textit{Fiscal Year 1981 TSR}}{\text{CY 1979 MPI}}$$

*governor for fiscal year 1980–1981.*" Mo. CONST. art. X, sec. 17(1) (emphasis added).[3]

The parties agree that the governor's budget message for fiscal year 1980–81 included the conservation sales tax that was originally enacted by a constitutional amendment approved by the voters in 1976. By referring to the governor's budget message of 1980–81, which existed before the time the Hancock Amendment was submitted to the voters, the Hancock Amendment established a fixed list of the revenue sources that are to be included in what the parties call the "base year ratio"—that is, "the ratio of total state revenues in fiscal year 1980–1981 divided by the personal income of Missouri in calendar year 1979." Mo. CONST. art. X, sec. 18(a). It is significant that the amendment does not simply refer to the fiscal year 1980–81 revenues to define the base year, but rather refers to a list that was in existence and fixed as of November 1980 when voters approved the amendment. Thus, the components of "total state revenues" are not subject to change, even by the addition or repeal of taxes at the same 1980 election when the Hancock Amendment was adopted. In fact, the defendants in *Buechner v. Bond,* 650 S.W.2d 611 (Mo. banc 1983), attempted to inflate the base year revenue, and hence the base year ratio and revenue limit for the next year, by including as "revenue" the opening balance of revenues left over from previous years. That attempt was rejected by this Court in *Buechner* by adhering to the reference to revenue as used in the governor's budget message for fiscal year 1980–1981, as prescribed in the article X, section 17 definition of "total state revenues." 650 S.W.2d at 613.

The *Buechner* decision required a change in the formula to omit prior year revenues. Thereafter, the commissioner of administration and the state auditor came to an agreement on what figures to include the in "base year" revenue total, and in 1985 fixed the "base year ratio" at .056395 (total state revenues in fiscal year 1980–1981 divided by personal income in Missouri in 1979). That is the ratio figure that has been used consistently since that time.

This base year calculation was not changed by this Court's decision in *Conservation Federation,* which did not address the base year calculation in the Hancock Amendment. That decision involved only the question of the effect of the passage, on the same day as the vote on Hancock in 1980, of an amendment to article IV, section 43(b), which mandated that funds raised by the conservation sales tax in section 43(a) be spent only for conservation purposes. Under the revised section 43(b), this Court held that money raised by the conservation sales tax could not be appropriated by the general assembly for Hancock refunds because such spending was not for conservation purposes. This Court's opinion specifically notes that the amendment to article IV, section 43(b) was approved by a greater number of votes than the Hancock Amendment; thus, the provisions relating to the conservation tax prevail over anything in the Hancock Amendment that may conflict. This Court accordingly treated the

---

**3.** Section 17. Definitions:

As used in sections 16 through 24 of Article X:

(1) "Total state revenues" includes all general and special revenues, license and fees, excluding federal funds, as defined in the budget message of the governor for fiscal year 1980–1981. Total state revenues shall exclude the amount of any credits based on actual tax liabilities or the imputed tax components of rental payments, but shall include the amount of any credits not related to actual tax liabilities.

conservation sales tax in the same manner as a voter approved tax. Under *Goode v. Bond, supra,* a voter approved tax is not subject to the revenue limit of article X, section 18(a), and is not subject to being included in the revenues subject to Hancock refunds.

Neither the commissioner of administration, nor the state auditor in her calculation and oversight capacity, erred in concluding that the calculation of the base year ratio was unaffected by our decision in *Conservation Federation.* The trial court's contrary conclusion is reversed.

The Tax Credit Claims

The two claims involving tax credits are closely related. Taxpayers first claim that most, if not all, of the tax credits issued under the various statutes should be included in "total state revenues," because such credits are not based upon taxpayers' tax liability. The other tax credit claim is that taxpayers who use tax credits to offset or to "pay" their tax liabilities should be entitled to Hancock refunds based upon their tax liabilities before application of the tax credits.

The portion of the Hancock Amendment that governs treatment of tax credits provides:

"Total state revenues shall exclude the amount of any credits based on actual tax liabilities or the imputed tax components of rental payments, but shall include the amount of any credits not related to actual tax liabilities." Mo. CONST. art. X, sec. 17(1). (This subsection is quoted in full in footnote 3, *supra*.)

The taxpayer parties argue that tax credit programs, most enacted in recent years, defeat the "purpose" of the Hancock Amendment by artificially reducing total states revenues, thereby depriving income taxpayers of further Hancock refunds. There are over 40 tax credit programs in state statutes in effect during the 1995–1999 time period at issue in this case. The trial court found no evidence to support the "insinuation that legislative approval of new tax credits is employed as a means of circumventing the Hancock Amendment."

The Hancock Amendment provides a formula and definitions. This Court has consistently interpreted the Hancock Amendment in light of its purpose to keep state taxation and spending in check. *See, e.g., Keller v. Marion County Ambulance Dist.,* 820 S.W.2d 301, 302 (Mo. banc 1991). The trial court concluded that the effect of tax credits is to reduce state revenues, which is consistent with purpose of Hancock. But regardless of how the purpose of a provision is inferred, purpose does not change the language of the constitution. With the provision at issue here, the meaning of the words is clear. To go beyond the words of the Hancock Amendment in these circumstances, to consider whether these tax credit provision contravene the "purpose" of the Amendment, is to venture into a policy dispute between these taxpayer litigants, the general assembly and other state officials as to the wisdom, fairness or efficacy of the various tax credit programs that have been enacted.

The Hancock Amendment establishes a method for determining the limit on state revenues. It does not tell the legislature and governor how to get there. The choices involving taxes, tax cuts, deductions, exemptions and credits are for the legislature and governor to make, so long as the results are consistent with the Hancock limit.

■ The Hancock Amendment has been interpreted as establishing a "cash basis" for calculating total state revenues and the revenue limit. *Missourians for Tax Justice Education Project v. Holden,* 959 S.W.2d 100, 106 (Mo. banc 1997). Moneys

not paid into the state treasury or not received in the fiscal year in question are not revenue. *Id.; see also Kelly v. Hanson, supra,* 959 S.W.2d at 111.

There are, as noted, numerous tax credit provisions in state law. Generally when a taxpayer makes an expenditure that qualifies for a tax credit, the amount of the credit reduces the taxpayer's liability on the tax return filed for that year. When a tax credit is taken, that is, used to reduce a taxpayer's liability, the credit reduces the revenue received by the state treasury. Many of the state's tax credits limit how much of the total credit may be redeemed by a taxpayer in any one year,[4] and some limit the aggregate amount of tax credits per year for a given purpose.[5] An unused portion of a tax credit generally may be carried forward to reduce tax liability in future years.[6] In a few cases, if a tax credit exceeds the taxpayer's liability, the taxpayer will receive a "refund." [7]

The taxpayer litigants and the state and its officials take diametrically opposing positions on how these tax credits are to be treated under the quoted portion of article X, section 17(1). The taxpayers assert that none of the tax credits are "based on actual tax liabilities," while the state offi-cials maintain that all tax credits are "based on actual tax liabilities." The taxpayers assert that these tax credits constitute public spending, and are a substitute for money that would otherwise be collected and spent directly from the state treasury. The state officials, however, point out that these all involve moneys that never reach the state treasury and, therefore, cannot be included in the concept of "total state revenues."

■ The meaning of the constitutional provision referring to tax credits can be explored by referring to the senior citizen property tax relief tax credit, sections 135.010 to 135.035, RSMo 2000, and 12 CSR 10–22.010. An earlier version of this statute was in effect at the time of the adoption of the Hancock Amendment, and the tax credit language of section 17(1) of article X seems to reflect this kind of credit.[8] The senior citizen property tax relief tax credit is particularly apt because the Hancock Amendment expressly refers to credits based on "imputed tax components of rental payments"—the only reference in Missouri law to such a term was section 135.010.6, RSMo 1978. The senior citizen property tax relief provisions offer an individual a tax credit of up to $750

---

4. See, for example, the tax credit for adopting a special needs child, sections 135.325 to 135.339, RSMo 2000.

5. See, for example, section 135.550, which authorizes tax credits for contributions to shelters for victims of domestic violence, which limits the aggregate of such credits to $2 million per year. Section 135.550.6. As with many tax credits, the amount that can be claimed is only a portion of the taxpayer's contribution or expenditure.

6. An example of such a provision is in the development tax credit program, sections 32.100 to 32.125, designed to encourage creation of jobs in blighted areas.

7. For the period relevant to this case, statutes that provide "refundable" tax credits include the senior citizen property tax relief law, sections 135.010 to 135.035, the higher education scholarship tax credits, section .173.196, the business use incentives for large-scale development (BUILD) Missouri program, sections 100.700 to 100.850, and the tax credit for recycling flexible cellulose casing, section 260.285.

8. There were two other tax credits in existence when Hancock was adopted, the neighborhood assistance program, section 32.100, which took effect in 1978, and the business facilities tax credit, section 135.100, which was signed into law June 10, 1980, during the *initiative petition campaign for the Hancock Amendment.*

($500 was the amount in 1980), for property taxes paid on the home and up to five acres surrounding it or for imputed property tax of 20 percent of rent payments if the taxpayer is a renter. To qualify the taxpayer must be over 65 years of age or disabled[9] and meet the income eligibility guidelines. The credit is "refundable;" that is, if the credit exceeds the taxpayer's tax liability, the director of revenue will treat the unused portion of the credit as an overpayment of income tax and will send the taxpayer a refund. Section 135.020, RSMo 1978 and RSMo 2000.

To apply the tax credit language of Hancock, a tax credit used to reduce a person's tax liability, as well as "imputed tax components of rental payments," as in section 135.010(7),[10] are specifically to be excluded from "total state revenues."

The trial court interpreted the tax credit provisions as this Court does. Its decision excludes from the definition of "total state revenues" any tax credit that comes within the taxpayer's tax liability. If there is a credit that exceeds a taxpayer's liability, and the amount is refunded by the director of revenue, then the second part of the tax credit sentence applies—the excess credit to be "refunded" would be included in total state revenues because it was "not related to actual tax liabilities." In the case of the senior citizen property tax relief, however, the state takes the position that the amount of any such "refund" would not be included in total state revenues. The reason is that the tax credit is "related to" actual tax liability or the imputed value of rent payments because it is based on the taxpayer's payment of property tax, or the constitutionally recognized tax equivalent in rent. Although property taxes are not paid to the state, but to local governments, the language of Hancock is not limited to state income tax liability but more generally to "tax liabilities."[11]

As to the existence of other tax credits that offer a "refund," the trial court flatly concluded that the taxpayer litigants "have failed to offer any evidence of tax credits that exceed a taxpayer's actual tax liability. They have failed, therefore, to demonstrate the existence of any amount of a tax credit that should be included in TSR [total state revenues]."

Most tax credit statutes appear to limit the tax credit to the taxpayer's actual tax liabilities. However, there appear some that may offer the prospect of a "refund" that would be includable in "total state revenues." But the record is not clear whether there have been payments of "refunds" to taxpayers whose tax credits exceeded their tax liabilities.

The state apparently does not separately account for tax refunds that are the result of a taxpayer's tax credit exceeding tax liabilities. The state treats these refunds as it does refunds for overpayment of taxes. That practice does, as the taxpayers point out, make the second part of the tax credit sentence in article X, section 17(1) meaningless. The tax credit refunds should not be included in the total of refunds for overpayment of taxes, but should be separately tallied and included in "total state revenues" as section 17(1) requires. It may seem strange that a payment from the treasury is counted as "revenue," but that is precisely what article X, section 17(1) requires when its says that tax credits "not related to actual tax liabilities"

---

9. The disability provision was not in effect in 1980, but was added in 1992.

10. RSMo 2000. In RSMo 1978, the same section is 135.010(6).

11. We do not decide whether the state's position is correct, since the issue, strictly speaking, is not before this Court.

shall be included in "total state revenues." That provision is to ensure that any amounts of tax credits that exceed tax liabilities, and result in payments from the treasury, will not result in a deduction in the amount of "total state revenues" for the purpose of computing the Hancock limit.

The taxpayers have not, in this Court, disputed the trial court's conclusion that there was no evidence as to tax credit payments that should be included in "total state revenues." Ordinarily this might be treated as a failure of proof and a failure to preserve trial court error. However, in pursuing the all-or-nothing approach to this issue, the taxpayer parties did not separately identify payments to taxpayers that represent tax credits in excess of tax liabilities. The taxpayer litigants have been designated as representatives of a class of all income taxpayers; it is appropriate for the trial court to require the parties to determine, for the sake of the entire class of taxpayers, whether there have been payments of tax credits in excess of liabilities that should be included in "total state revenues." Accordingly, although we generally uphold the trial court's interpretation of the tax credit language of article X, section 17(1), we vacate that portion of the trial court's judgment dealing with tax credits and remand this case to the trial court to determine whether there have been payments of "refunds" that represent the excess of tax credits over actual tax liabilities and, if so, what relief, if any, is to be given to the class of income taxpayers.[12]

Tax Credits as Payments of Taxes—Hancock Refunds

■ There is a subclass that contends that taxpayers who took tax credits to reduce their tax liabilities should be given Hancock refunds based on their tax liabilities prior to the use of the tax credit. These taxpayers liken tax credits to "monopoly money" issued by the state by which to pay taxes. Analogies and metaphors aside, it should be plain from the discussion in the foregoing section that tax credits reduce revenue to the state treasury. The only circumstance in which tax credits are added to "total state revenues" is when they represent "refunds" paid where a person's tax credits exceed the person's tax liabilities and the credit is "not related to actual tax liabilities." Mo. CONST. art. X, sec. 17(1).

The tax credits used by these taxpayers reduced their tax liabilities. What they seek is a Hancock refund on taxes not actually paid. The Hancock Amendment offers no basis for treating tax credits to these taxpayers as anything other than a reduction in their actual tax liabilities as stated on their income tax returns. The trial court's denial of relief as to that issue is correct.

Conclusion

The portion of the trial court's judgment and order requiring the state and its officials to recalculate the Hancock Amendment revenue limit by excluding the conservation sales tax from the fiscal year 1980–1981 component of the formula, referred to as the base year ratio, is reversed.

That portion of the judgment, as to the subclass of taxpayers that received tax credits, holding that individual Hancock refunds should be based only on the

---

12. The parties hint that such relief may be limited to prospective relief as to such payments. These are matters best addressed in the first instance in the trial court. *Green v.* *Lebanon R–III School Dist.*, 13 S.W.3d 278, 286 (Mo. banc. 2000) (Price, C.J., concurring).

amount of income taxes paid, and not the amount of tax credits used by the taxpayers to reduce tax liability, is affirmed.

The remaining portion of the trial court's judgment, in particular as it relates to the interpretation of the treatment of tax credits in article X, section 17(1), is vacated, and the case is remanded to the trial court for proceedings consistent with this opinion.

PRICE, C.J., LIMBAUGH, WHITE, HOLSTEIN and BENTON, JJ., concur.

LAURA DENVIR STITH, J., not participating.