Barbara MANZARA and Keith
Marquard, Appellants,

v.

STATE of Missouri, et
al., Respondents.

No. SC 91025.

Supreme Court of Missouri,
En Banc.

Aug. 2, 2011.

Irene J. Smith, St. Louis, for Manzara and Marquard.

James R. Layton, Maureen Beekley, Attorney General's Office, Jefferson City, for The State.

Paul J. Puricelli, Robb E. Hellwig, Stone, Leyton & Gershmann, St. Louis, for Northside Regeneration.

MARY R. RUSSELL, Judge.

Two taxpayers filed a petition for declaratory judgment challenging the constitutional validity of section 99.1205,[1] the Distressed Areas Land Assemblage Tax Credit Act (Act). They claimed that the tax credits provided by the Act constituted an unconstitutional grant or lending of public money to private persons, associations, or corporations. The trial court declined to enter declaratory judgment because the taxpayers did not have standing to challenge the statute.

The taxpayers appealed to this Court, arguing that they had standing because the tax credits were direct expenditures of funds generated through taxation. They also argued that the tax credits given under the Act are unconstitutional. Reaching the merits of the taxpayers' claims is unnecessary because the taxpayers did not meet their burden to prove they had standing to bring a challenge to the statute as the issuance of tax credits does not constitute a direct expenditure of funds generated through taxation. Further, this Court agrees with the recent statement of the Supreme Court of the United States that tax credits are not public expenditures. The trial court's judgment is affirmed.

## I. Background

### A. Distressed Areas Land Assemblage Tax Credit Act

The Act establishes tax credits to encourage redevelopment of historically distressed or disadvantaged areas. Qualified redevelopers may apply for a land assemblage tax credit to offset the acquisition and interest costs incurred by the redeveloper in obtaining the land.

The eligibility requirements and limitations are regulated by the statute. To receive the tax credit, preconditions must be met. First, for land to be an "eligible parcel," it must be located within an eligible project area,[2] slated for redevelopment, acquired without the commencement of condemnation proceedings, and have no outstanding taxes, fines, or bills owed to

---

1. All statutory references are to RSMo 2000, as amended by Supp.2010.

2. An "eligible project area" is an area that satisfies five requirements: (1) it must consist of at least 75 acres; (2) at least 80 percent of the area must be located within a qualified census tract, as designated under 26 U.S.C. § 42, or within a distressed community, as it is defined in section 135.530; (3) at least 50 of the 75 acres of land must be eligible parcels; (4) the average number of parcels per acre must be four or more; and (5) less than 5 percent of the acreage within the area must consist of owner-occupied residences that the applicant for the tax credit has identified for acquisition under the redevelopment or renewal plan. Section 99.1205.2(8).

the municipal government. Section 99.1205.2(7).

Second, the person or entity seeking the tax credit must be an applicant, as defined in the statute. An applicant is a person, firm, partnership, trust, limited liability company, or corporation that has acquired enough land to constitute an eligible project area. Section 99.1205.2(2). In addition, the applicant must have been appointed or selected as a redeveloper by a municipal authority under an economic incentive law. *Id.*

Once an applicant acquires an eligible parcel, the Act allows a tax credit to issue. An applicant is entitled to a tax credit for 50 percent of the acquisition costs and 100 percent of the interest incurred five years after acquisition. Section 99.1205.3. The tax credit may be applied to taxes imposed under chapters 143,[3] 147,[4] and 148,[5] except for sections 143.191 to 143.265.[6] *Id.* If the amount of the credit exceeds the total tax liability for the year in which the applicant qualifies for a tax credit, the remaining tax credit may be carried over for the succeeding six years. Section 99.1250.4. Further, the tax credits may be transferred, sold, or assigned. *Id.* The transferee, purchaser, or assignee may use the tax credits to offset 100 percent of the tax liability imposed under chapters 143, 147, and 148, except for sections 143.191 to 143.265. Section 99.1205.5.

### B. Procedural History

Barbara Manzara and Keith Marquard (the taxpayers) are taxpayers who live within a qualified census tract, as designated under 26 U.S.C. § 42, and within a distressed community, as defined by section 135.530. They filed a petition for declaratory judgment challenging the validity of the Act, claiming that section 99.1205 violates article III, section 38(a) of the Missouri Constitution because the tax credit is a "grant of public money or property" to a "private person, association or corporation." Alternatively, taxpayers contended that the Act violates article III, section 39(1)–(2) of the Missouri Constitution because the tax credit is a "lending of the credit of the state in aid or to any person, association, municipal or other corporation," or a "pledge [of] credit of the state for the payment of the liabilities ... of any individual, association, municipal or other corporation."

The circuit court rejected the taxpayers' argument, finding that they lacked standing to bring their claims and that, even if they did have standing, section 99.1205 was constitutional because it serves a public purpose. The taxpayers appeal, arguing that the circuit court erred in finding that they lacked standing and that the Act was constitutional.[7]

### II. Standing

■ The preliminary issue before this Court is whether taxpayers have standing to challenge the tax credits given to redevelopers under the statute. *See E. Mo. Laborers Dist. Council v. St. Louis County,* 781 S.W.2d 43, 45–46 (Mo. banc 1989) ("Regardless of an action's merits, unless the parties to the action have proper standing, a court may not entertain the

---

3. Chapter 143 contains the provisions for Missouri's income tax.

4. Chapter 147 contains the provisions for Missouri's corporation franchise tax.

5. Chapter 148 contains the provisions for the taxation of financial institutions in Missouri.

6. Sections 143.191 to 143.265 concern employer withholding of income taxes from wages.

7. This Court has jurisdiction pursuant to article V, section 3 of the Missouri Constitution.

action."). Standing is an antecedent to the right to relief. *Comm. for Educ. Equal. v. State*, 878 S.W.2d 446, 450 n. 3 (Mo. banc 1994).

 Standing is a question of law, which is reviewed de novo. *Mo. State Med. Ass'n v. State*, 256 S.W.3d 85, 87 (Mo. banc 2008). To have standing, the party seeking relief must have "a legally cognizable interest" and "a threatened or real injury." *E. Mo. Laborers*, 781 S.W.2d at 46. As the parties seeking relief, the taxpayers bear the burden of establishing that they have standing. *See Kansas City v. Douglas*, 473 S.W.2d 101, 102 (Mo.1971).

Taxpayer standing has a long history in Missouri. The issue of taxpayer standing first arose in *Newmeyer v. Missouri & Mississippi Railroad*, 52 Mo. 81 (1873). There, the court held that taxpayers had standing to bring a suit to challenge the county's subscription to capital stock of a railroad. *Id.* at 89. The court reasoned that the county's taxpayers suffered a peculiar injury—the burden of paying for the subscription. *Id.* After Newmeyer, Missouri courts have held that when a public interest is involved and public monies are being expended for an illegal purpose, taxpayers have the right to enjoin the action. *See, e.g., Civic League of St. Louis v. City of St. Louis*, 223 S.W. 891 (Mo.1920); *Berghorn v. Reorganized Sch. Dist. No. 8, Franklin Cnty.*, 364 Mo. 121, 260 S.W.2d 573 (1953); *Tichenor v. Mo. State Lottery Comm'n*, 742 S.W.2d 170 (Mo. banc 1988).

 In *Eastern Missouri Laborers*, this Court in 1989 revisited taxpayer standing. The court acknowledged that the mere filing of a lawsuit does not confer taxpayer standing upon a plaintiff. *E. Mo. Laborers*, 781 S.W.2d at 46. Instead, a taxpayer must establish that one of three conditions exists: (1) a direct expenditure of funds generated through taxation; (2) an increased levy in taxes; or (3) a pecuniary loss attributable to the challenged transaction of a municipality. *Id.* at 47. The taxpayers rely on the first option as their basis for standing, arguing that the tax credits given under the Act are a direct expenditure of funds generated through taxation.[8]

 Taxpayer standing is available "so that ordinary citizens have the ability to make their government officials conform to the dictates of the law when spending public money." *Ste. Genevieve Sch. Dist. R–II v. Bd. of Aldermen of the City of Ste. Genevieve*, 66 S.W.3d 6, 11 (Mo. banc 2002). As this Court has recognized,

> Public policy demands a system of checks and balances whereby taxpayers can hold public officials accountable for their acts.... Taxpayers must have some mechanism of enforcing the law. Today's decision provides the door through which taxpayers may enter the courts to seek enforcement.

*E. Mo. Laborers*, 781 S.W.2d at 47.

### A. Is a Tax Credit a Direct Expenditure of Funds Generated Through Taxation?

 While this Court has put forth the test for taxpayer standing, it never has interpreted what "a direct expenditure of funds generated through taxation" consti-

---

8. The taxpayers do not ask this Court to revisit the requirements for taxpayer standing in the context of challenging the validity of a statute granting tax credits. Without such briefing by the taxpayers, it would be inappropriate for this Court to analyze whether taxpayer standing should be expanded. *See, e.g., Thummel v. King*, 570 S.W.2d 679, 686 (Mo. banc 1978) ("It is not the function of the appellate court to serve as advocate for any party to an appeal. That is the function of counsel. It would be unfair to the parties if it were otherwise.... Courts should not be asked or expected to assume such a role.").

tutes. Dictionary definitions provide guidance. Direct, when used as an adjective, is defined as "without any intervening agency or step." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED 640 (1993). An expenditure is "[a] sum paid out." BLACK'S LAW DICTIONARY 658 (9th ed.2009). A fund is "[a] sum of money or other liquid assets." *Id.* at 743. Generate is defined as "to come into existence." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED at 945. Taxation is "the means by which the state obtains the revenue required for its activities." BLACK'S LAW DICTIONARY at 1598. Therefore, "a direct expenditure of funds generated through taxation" is a sum paid out, without any intervening agency or step, of money or other liquid assets that come into existence through the means by which the state obtains the revenue required for its activities.

The tax credits created by the Act do not meet the definition of "a direct expenditure of funds generated through taxation," as tax credits are not expenditures. Expenditures typically occur in government when checks are written by the state treasurer based on appropriations or warrants. No such withdrawal of public funds or such "expenditure" occurs with the granting of a tax credit. While "expenditures" and "tax credits" might be compared in that their end result is "less" money in the state treasury, the similarity is superficial. Said differently, a tax credit expresses the legislature's wish to declare a portion of the pool of taxable assets off-limits to its own power to collect taxes. Properly understood, this does not result in "less" money in the treasury because the legislature never wished it to be there in the first place. A tax credit is not a drain on the state's coffers; it closes the faucet that money flows through into the state treasury rather than opening the drain.

Further, taxpayers never argued that the money at issue was received by the State or that it ever belonged to the public. The legislature, through approving the Act, decided to leave the money in the hands of a particular person or entity. Its passage of the Act constituted an acknowledgment that the State never would have the tax revenue to spend because it was waived by tax credits. Lowering tax liability by such means does not move money out of the public treasury; it leaves it in private hands. A particular person or entity would retain the power to spend the money instead of paying the money over to the government as taxes. Insofar as the purpose of taxpayer standing is to give taxpayers a way to conform government spending to the law, that purpose is not served if the State is spending nothing.

### B. Missouri Case Law

Although no reported Missouri case has considered whether a tax credit is a direct expenditure of funds generated through taxation for the purpose of taxpayer standing, in *W.R. Grace & Co. v. Hughlett,* 729 S.W.2d 203 (Mo. banc 1987), the court considered whether a taxpayer had standing to bring a constitutional challenge against the "manufacturers tax," which gave exemptions for certain types of tangible personal property. The taxpayer argued that the exemptions resulted in a lack of tax uniformity violative of the Missouri Constitution. *Id.* at 204–05. Before considering the constitutional validity of the exemptions, *W.R. Grace* determined whether appellant had standing to challenge the validity of the statute. *Id.* at 206. The court stated that it "fail[ed] to see how it can be said that [the taxpayer] has been '*adversely affected by the statutes in question*' when those statutes ... merely excuse the tax obligations of others." *Id.* at 206–07 (quoting *Ryder v.*

*Cnty. of St. Charles,* 552 S.W.2d 705, 707 (Mo. banc 1977)); *cf. State ex rel. Kansas City Power & Light Co. v. McBeth,* 322 S.W.3d 525, 529 (Mo. banc 2010) (noting that taxpayers "lack standing to challenge other taxpayers' property tax assessments, as they are not injured personally by others' assessment calculations"). The taxpayer was not "adversely affected" because, if the "exemptions" were ruled unconstitutional, the taxpayer would not have been entitled to receive a refund of the taxes it paid under a wholly separate taxing statute. *W.R. Grace,* 729 S.W.2d at 207.

Although the taxpayer in *W.R. Grace* did not claim that it had taxpayer standing to challenge the statute, the court considered the possibility and analyzed the issue. *Id. W.R. Grace* recognized that "it might well be argued that [the taxpayer] has standing because the net result of granting an exemption to others would not seem to differ in substance from the spending of tax monies." *Id.* The court acknowledged that in each situation, the result is the same: the state treasury will be diminished. *Id.* It rejected that contention because there is no "public interest" when the appellant challenges the statutory "exemptions" given to other taxpayers. *Id.; see also Civic League of St. Louis v. City of St. Louis,* 223 S.W. 891, 893 (Mo.1920) (finding that a taxpayer has standing to challenge public funds dissipated for an illegal purpose if there are "public interests" involved).

*W.R. Grace's* analysis regarding the effect of tax exemptions on the state treasury is instructive here. The standing test asserted by taxpayers here is whether there is a direct expenditure of funds generated through taxation. The tax exemptions in *W.R. Grace* and the tax credits here are similar in that they both result in a reduction of tax liability. The govern-

ment collects no money when the taxpayer has a reduction of liability, and no direct expenditure of funds generated through taxation can be found. The tax credits provided by the Act merely excuse the tax liability of redevelopers or persons to whom it is assigned or sold. The court in *W.R. Grace* correctly concluded that the taxpayer did not have standing as there was no direct expenditure of funds generated through taxation. Likewise, tax credits are not from monies paid into the state treasury by taxpayers as tax revenue and are not direct expenditures of funds generated through taxation.

Judge Wolff's concurrence cites *Ste. Genevieve School District* as support for its conclusion that tax credits given under the Act are a direct expenditure of public money generated through taxation. There, the court held that a taxpayer had standing to challenge whether the city had authority to amend a redevelopment plan without reconvening the Tax Increment Financing (TIF) commission. 66 S.W.3d at 11. That case is distinguishable from the facts here. In *Ste. Genevieve School District,* unlike here, it appears there was a challenge to the proposed *expenditure* of funds generated through taxation under the amended redevelopment plan. Further, it is distinguishable in that the holding in *Ste. Genevieve School District* arose in the unique context of analyzing the TIF statutes.

The taxpayers and Judge Wolff's concurrence incorrectly rely on *Curchin v. Missouri Industrial Development Board,* 722 S.W.2d 930 (Mo. banc 1987), to support their position that tax credits are a grant of public money resulting in taxpayer standing. In *Curchin,* the court decided that the allowance of a tax credit constitutes a grant of public money or property in violation of article III, section 38(a), which bans the grant of public money or

property to private entities.[9] *Id.* at 933. The court held that there was a violation of the constitution by stating that a "tax credit is as much of a grant of public money or property and is as much a drain on the state's coffers as would be an outright payment by the state." *Id.*

But any reliance on *Curchin* is misplaced. The issue of standing was not raised or addressed in *Curchin.* The court in *Curchin* adjudicated the merits of the case by analyzing the constitutional question of whether tax credits are the grant of public money. But that question is different from the preliminary issue before this Court—whether taxpayers have standing. *Curchin* is not relevant. There is a dispositive distinction between the test for standing—whether there is a direct expenditure of funds generated through taxation—as opposed to the constitutional question—whether a tax credit is a grant of public money or property to a private person, association, or corporation.

By relying on *Curchin* as support for its position that taxpayers have standing, Judge Wolff's concurrence conflates the requirements for standing and constitutional validity under article III, section 38(a). By merging the two requirements into one, it would require this Court to abandon over a century of precedent. Since *Newmeyer*, which was decided in 1873, taxpayer standing has required a challenge to an expenditure of public funds.[10] This Court is mindful of stare decisis and declines to overrule *Newmeyer* and its progeny. *See Sw. Bell Yellow*

*Pages, Inc. v. Dir. of Revenue,* 94 S.W.3d 388, 390 (Mo. banc 2002) ("Under the doctrine of stare decisis, a decision of this court should not be lightly overruled, particularly where, as here, the opinion has remained unchanged for many years.").

### C. Supreme Court of the United States

While this case was under submission, the Supreme Court of the United States issued an opinion in which it determined that a tax credit is not a direct expenditure of funds generated through taxation.[11] In *Arizona Christian School Tuition Organization v. Winn,* —— U.S. ——, 131 S.Ct. 1436, 1440, 179 L.Ed.2d 523 (2011), a group of taxpayers challenged an Arizona statute that provided for tax credits for contributions made to school tuition organizations. The school tuition organizations then would distribute the contributions as scholarships to students attending private schools, many of which are religious. *Id.* The taxpayers challenged the Arizona statute as violative of the Establishment Clause. *Id.*

■ The Supreme Court's threshold question was whether the taxpayers had standing to bring their claim. *Id.* The taxpayer standing doctrine is applied narrowly in federal courts, as it only pertains to alleged violations of the Establishment Clause. *Id.* at 1445. Taxpayers have standing in federal courts in such cases if: (1) there is a "logical link" between taxpayer status and the legislative enactment; and (2) there is "a nexus" between taxpayer status and the constitutional infringe-

---

9. The dissenting judge disagreed, stating that "the tax credit provision does not constitute the 'lending of public credit' or the 'granting of public money' as those phrases are employed in the constitution." *Curchin,* 722 S.W.2d at 937 (Rendlen, J., dissenting).

10. While the nomenclature of this Court has changed throughout the years, taxpayer standing still requires expenditure of funds that the government generates through taxation.

11. This Court sought additional briefing from the parties regarding the effect of that opinion on the case at hand.

ment alleged. *Id.* (citing *Flast v. Cohen,* 392 U.S. 83, 102, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968)). " 'The taxpayer's allegation in such cases would be that his tax money is being extracted and spent in violation of specific constitutional protections against such abuses of legislative power.' " *Id.* at 1446 (quoting *Flast,* 392 U.S. at 106, 88 S.Ct. 1942).

The task for the Supreme Court was to determine whether a tax credit constituted public money that was extracted and spent in violation of the Establishment Clause. *See id.* at 1447. In that context, the Court concluded that a tax credit is not a government expenditure. *Id.* While tax credits and government expenditures have similar consequences, a tax credit does not implicate all taxpayers like a government expenditure does. *Id.* A government expenditure implicates every taxpayer. *Id.* "A dissenter whose tax dollars are 'extracted and spent' knows that he has in some small measure been made to contribute to an establishment in violation of conscience." *Id.* (quoting *Flast,* 392 U.S. at 106, 88 S.Ct. 1942). "[T]he taxpayer's direct and particular connection with the establishment does not depend on economic speculation or political conjecture." *Id.* On the other hand, a tax credit merely has an effect on the taxpayer who claims it. *Id.* There is no specific connection between the dissenting taxpayer and the establishment. *Id.* "Any financial injury [to the dissenting taxpayer] remains speculative." *Id.*

The taxpayers here argue that *Arizona Christian School* is inapplicable because federal taxpayer standing is distinct from Missouri taxpayer standing. It is true that the United States Constitution does not have provisions that are similar to article III, sections 38 and 39 of the Missouri Constitution, which prohibit the State from expending taxpayer money or

lending credit to private persons, associations, or organizations. And the test for taxpayer standing in federal courts is narrower than the standard for taxpayer standing in Missouri courts.

Despite the Supreme Court's decision in *Arizona Christian School* arising in a different context, it is instructive because the taxpayer standing in both federal and Missouri courts is similar: both require an expenditure. Before the Court determined whether there was an Establishment Clause violation under the federal constitution, it analyzed generally whether a tax credit is an expenditure of public money. The same analysis is required in this case; determining whether tax credits are a direct expenditure of funds generated through taxation must be analyzed as a preliminary matter before reaching the constitutional question.

As discussed previously, this Court agrees with the Supreme Court's holding in *Arizona Christian School.* Here, the redeveloper tax credit does not implicate every taxpayer as a government expenditure does. When a government expenditure extracts money from the public treasury, every taxpayer's dollars contribute to the disbursement. A tax credit, on the other hand, merely affects the taxpayer who claims it. Because the money never is deposited into the state's coffers, any effect on the taxpayers in general is "merely speculative." *See Arizona Christian School,* 131 S.Ct. at 1447.

### III. *Taxpayers' Right to Complain*

The prediction in Judge Wolff's concurrence that today's holding will result in a taxpayer not having a right of recourse if he disagrees with the legislature's decision to issue tax credits is an exaggeration. Our system of government provides for checks and balances whereby taxpayers can hold public officials accountable for

their acts. Taxpayers always retain the power at the ballot box to remove elected officials who support unpopular tax credits. And taxpayers, through the initiative process, may propose a law or an amendment to our state constitution to prohibit the issuance of tax credits. *See* Mo. Const. art. III, sec. 49 ("The people reserve power to propose and enact or reject laws and amendments to the constitution by the initiative, independent of the general assembly . . . .").

To illustrate its concern that taxpayers do not have a remedy, Judge Wolff's concurrence forecasts that if tax credits are not considered public money, then taxpayers would not have standing to challenge the legislature's establishment of a tax credit program to help build new churches. The parties do not make this argument, nor is there any evidence in the record that the legislature ever has granted churches or other religious institutions tax credits. This Court does not rule on hypotheticals or speculative issues not raised by the case. This is a false alarm because it is unlikely that the legislature would set up such a tax credit program in the future for churches because religious institutions typically are exempt from taxes. *See, e.g.,* section 137.100(5) (providing property tax exemption for property ordinarily used for religious purposes); section 144.030.2(19) (providing sales tax exemption for sales made by or to religious institutions). As tax credits lower tax liability, they are given to entities or persons who meet eligibility requirements and have *potential* liability such as redevelopers here, as opposed to churches, which have *no potential* tax liability. Any tax credit for religious institutions is pointless.

Further, Judge Wolff's concurrence's attempt to distinguish types of tax credits is irrelevant to standing. Although this concurrence implies that some tax credits are

good and others are not, it is not clear from a standing viewpoint, as opposed to a policy viewpoint, whether there is any difference. All tax credits are intended to encourage private citizens or entities to spend their own money on a particular project to improve the lives of the public, while avoiding the need to spend public money. Whether tax credits are a good idea or improve the lives of the public is a different issue, and taxpayers retain the power to challenge the issuance of tax credits as mentioned above.

This Court's opinion does nothing to constrain the taxpayers' right to use the courts to challenge the expenditure of public money if it is being spent on matters that the constitution forbids or on projects that have no public purpose.

### IV. Conclusion

The taxpayers did not meet their burden to prove that they have standing. The trial court did not err in finding there was no taxpayer standing as the Act's issuance of tax credits did not constitute a direct expenditure of funds generated through taxation. Further, this Court agrees with *Arizona Christian School* that tax credits are not government expenditures. Without standing, taxpayers cannot challenge the constitutional validity of the tax credits provided by the Act. Accordingly, the judgment is affirmed.

BRECKENRIDGE and FISCHER, JJ., concur; WOLFF, J., concurs in separate opinion filed; TEITELMAN, C.J., and PRICE, J., concur in opinion of WOLFF, J.; STITH, J., concurs in principal opinion and concurs in part in opinion of WOLFF, J., in separate opinion filed.

MICHAEL A. WOLFF, Judge, concurring.

#### Introduction

"First, do no harm"—a fundamental precept of medicine—needs to be applied

to this judicial decision, which may cause unnecessary harm to Missouri's law that freely grants standing to taxpayers to challenge governmental spending.

In determining that the taxpayer plaintiffs did not show that the tax credits in this case are an expenditure of public funds—which they are—the principal opinion takes the liberty, unnecessarily in my view, of distorting Missouri's case law on standing.

Although the principal opinion and Judge Stith's concurring opinion leave the door open to get the law right in some future case, there is no principled reason not to get the law right in this case, or—at the very least—to leave the law of standing undisturbed.

The principal opinion faults the taxpayer plaintiffs for not asking the Court in a separate "point relied on" to *extend* the standing doctrine to cover challenges to tax credit expenditures. But the taxpayers here properly rely on *Curchin v. Mo. Indust. Dev. Bd.*, 722 S.W.2d 930 (Mo. banc 1987), which held that that tax credits granted to a private party are indistinguishable from expenditures of public funds. Although *Curchin*, as is true of other taxpayer cases, did not expressly address the standing issue, *Curchin* applied the same analysis to tax credit expenditures as to other spending of public funds. There is no need to "extend" taxpayer standing to tax credit cases—the law already is there.

That said, I concur in the result of the principal opinion, because I believe that spending public funds through transferable tax credits under section 99.1205—which is done in conjunction with the city government for redevelopment in north St. Louis—is acceptable because, under Missouri cases, the expenditure is for a "public purpose."

The standards for what is a "public purpose" are so lax that one has to wonder why the majority would invoke the doctrine of standing—which could have the effect of cutting off *all* challenges to the expenditure of the public funds through tax credit programs. The damage to the law from calling this an expenditure for a public purpose is minimal; the damage the principal opinion does to the law by invoking standing poses substantial problems for Missouri law and the proper role of the state's courts.

Let us remember: First, do no harm. The law of taxpayer standing is crucial to ensuring government accountability under the Missouri Constitution. The majority should have left it alone.

### Taxpayers' Standing in Missouri

To bring a lawsuit, a person must have standing, that is, a stake in the outcome of the lawsuit. Missouri long has recognized that taxpayers have standing, *as taxpayers*, to challenge expenditures of public funds that a taxpayer plaintiff alleges are unlawful. Unlike the United States Constitution, the Missouri Constitution prescribes in detail the powers and limitations of the state government and its many subdivisions. Taxpayers regularly come to the courts of this state seeking to enforce specific constitutional provisions, alleging that the state or a political subdivision is violating the constitution. Taxpayer standing is central to holding state and local governments accountable to limits on spending and other activities as specified in the state constitution.

The state of Missouri gave Northside Regeneration, L.L.C., $28 million in transferable tax credits, which, when sold, would give Northside Regeneration about $25 million in real money to spend on its redevelopment project in the city of St. Louis. The principal opinion says the tax-

payers have not shown that this is not public money, and, therefore, they do not have "standing" to bring a lawsuit claiming that this grant violates the Missouri Constitution.

But the principal opinion casts doubt on whether taxpayers could challenge an action in which the state grants tax credits to a private company or organization—even when the state would be prohibited from spending public money directly for that purpose—because the money did not come directly from the state treasury and, therefore, the state's donation of money to this project—which the state itself calls an "investment"—is not subject to judicial review.

These taxpayers, Manzara and Marquard, claim that the money granted to Northside Regeneration violates article III, section 38(a) of the constitution, which provides that "The general assembly shall have no power to grant public money or property, or lend or authorize the lending of public credit, to any private person, association or corporation. . . ."[1]

Because the meaning of article I, section 38(a) may not be immediately obvious, I offer an example from a provision of the state constitution that is clear to illustrate my point: Article I, section 7 of the Missouri Constitution would prohibit spending state money to build a church.[2] But what if the state were to set up a program to which churches could apply for transferable tax credits to aid in building new churches? Having well-built new

churches, after all, would be a great benefit to the communities in which they are located and, presumably, would contribute to uplifting the morals of the state. But under the principal opinion's analysis, a taxpayer may lack standing and, therefore, could not challenge the legality of the state's action because a tax credit is not public money.

Really?

Not all tax credits are created equal. The transferable tax credits involved in this case share two characteristics:

1. They are granted to an applicant that applies for the credits and demonstrates to a state agency that the applicant's proposed use of the money is for the purpose set forth in the particular tax credit program established in the statute.

2. The tax credits can be sold, yielding real money for the project for which the tax credits are granted. The hypothetical church, described above, has no tax liability of its own, nor typically would a developer such as Northside Regeneration at the time it receives the tax credits. No problem; the church or the developer can take the credits to a bank or financial institution that will sell them to taxpayers who owe taxes to the state, and the taxpayer buyers can use the credits to pay their taxes. Typically, the institution will charge a commission, and the taxpayer who buys the credits will pay

---

1. There is no mention of "public purpose" in this provision. As discussed in the Public Purpose section of this opinion, however, the judicial gloss on this provision approves money for private entities if the spending is for a "public purpose." *See, e.g., Fust v. Attorney General for Mo.*, 947 S.W.2d 424, 429 (Mo. banc 1997); *Menorah Med. Ctr. v. Health & Educ. Facilities Auth.*, 584 S.W.2d 73, 79 (Mo. banc 1979).

2. Article I, section 7 provides that: "[N]o money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religion, or in aid of any priest, preacher, minister or teacher thereof, as such; and that no preference shall be given to nor any discrimination made against any church, sect or creed of religion, or any form of religious faith or worship."

less than face value—this discount is the incentive for the tax-credit buyer to purchase credits rather than using actual cash to pay the taxpayer buyer's taxes. The amount paid in commissions and discounts typically is about 10 percent of the face value of the tax credits,[3] which means that the nearly $28 million in credits would yield about $25 million in cash to Northside Regeneration.

What is a transferable tax credit?[4] It is a state-issued coupon that can be "redeemed"—that is, used instead of money—to pay taxes that the holder of the tax credit owes the state of Missouri. If the recipient of the tax credit owes no taxes, the recipient can sell the credit to someone who does owe taxes. Put simply, a $100 tax credit can be used to pay $100 in taxes owed to the state. It is a cash alternative.[5]

In fiscal 2009, there were 53 separate tax credit programs whose "redemptions"—that is, the amount of tax credits used to pay state taxes—totaled $584 million.[6] These transferable tax credits are not like the tax credits that taxpayers may claim as entitlements on their income tax returns. For example, if a taxpayer donates to a food pantry, a maternity home or a domestic violence shelter, he or she can claim a credit on the tax return—the credit is not transferable, it is limited in amount and the taxpayer claiming the credit does not have to submit an application to a tax credit program.[7] These cred-

---

3. Paul Rothstein & Nathan Wineinger, *Transferable Tax Credits in Missouri: An Analytical Review*, 3 FED. RES. BANK OF ST. LOUIS REGIONAL ECON. DEV., no. 2, at 53, 66–67 (2007) (Table 5).

4. I use the term "transferable" to refer to the tax credits at issue in this case in the same sense as the term is used in the Federal Reserve Bank analysis cited in footnote three, though some of the tax credits of the kind discussed here may have limits on their transferability.

5. The principal opinion answers the "church" hypothetical by pointing out the obvious fact that churches pay no taxes. That is precisely my point as well as the crucial distinction between "transferable" tax credits in this case and tax credits that only can be used by the taxpayer. The "tax credit programs" like those in this case separate the grantee of the credits from the taxpayer who uses the credits to pay taxes. A grantee such as a church (or Northside Regeneration) that has no tax liability of its own can get a cash benefit by selling the credits to someone who must pay a tax liability. There is no doubt, under the principal opinion's analysis, that the state could grant tax credits to churches to support their building programs, and there would be no judicial remedy.

6. *See* Missouri State Auditor, Audit Report No. 2010–47. *See also*, Missouri Tax Credit

Review Commission, *Report of the Missouri Tax Credit Review Commission* (Nov. 30, 2010), *available at* http://tcrc.mo.gov/pdf/TCRCFinalReport113010.pdf. "Redemptions" is the word used by the state auditor to describe the process of paying one's taxes by using a tax credit instead of cash. The report of the Missouri Tax Credit Review Commission notes that tax credit "redemptions" increased every year from fiscal 1998 ($102.7 million or 1.7 percent of the state's general revenue) to fiscal 2009 ($584.7 million or 7.8 percent of the state's general revenue) and declined in fiscal 2010 (to $521.5 million or 7.7 percent of general revenue). *Id.* at 3.

7. Section 135.647; section 135.600; sections 455.200, 455.220, 488.445. These tax credits for donations are similar to tax deductions in that they reward charitable giving when taxpayers file their returns. Tax deductions are amounts subtracted from adjusted gross income prior to calculation of the amount of taxes due. *See* section 143.111. The Distressed Land Assemblage Act differs from both the aforementioned tax credits and tax deductions because it is not tied to the amount of tax liability of the individual, and, instead, it is granted only after the applicant has fulfilled the program requirements of the act. *See* section 99.1205. Unless otherwise indicated, all statutory citations are to RSMo Supp.2010.

its are simply incentives inserted into the tax code to encourage or reward various kinds of donations and activities.

The "tax credit programs" such as the program that Manzara and Marquard challenge here—the "Distressed Area Land Assemblage Tax Credits" in section 99.1205—generally are referred to as "investments" on which the state expects to realize "a return."[8] The state grants the credits—which are assets of the state of Missouri—and hopes for a "return," the project sponsor receives the credits and converts them to cash to support the project, the financial institutions sell the credits and receive commissions, and the buyers of the credits receive credits worth more than they paid so they receive "returns" on their investment in buying the tax credits.

Everybody wins, except for the taxpayers to whom the principal opinion denies standing and, perhaps, others such as the next generation of workers whose education is funded insufficiently because today's grownups decided to spend the public's money—by tax credits—on other priorities.

In reading this "Distressed Area Land Assemblage Tax Credits" statute, one reasonably may infer that it was enacted to benefit one project in one city. This may have little relevance to the validity of the tax credit program in this case, but it is interesting to see the good uses that the well-connected with their lobbyists can find for state government, which raises again the question: Should the state government's financial favors bestowed through tax credits be beyond the reach of judicial review under the Missouri Constitution?

The Missouri Constitution, as noted, has many specific prohibitions and limitations on the spending of public money. These restrictions safeguard the scarce public resources that are needed to support essential public services, for instance, education, public health and public safety.

The principal opinion distorts Missouri precedents that recognize standing to sue in cases involving transferable tax credits, most notably *Curchin*, which held that providing a transferable tax credit—that is, a tax credit that can be sold—is the expenditure of public funds. 722 S.W.2d at 930. Instead of following Missouri case law that relates directly to the tax credits in this case, the principal opinion seems to get distracted by the federal constitutional standing analysis in a case involving Arizona's law that grants individual taxpayers up to $500 in non-transferable tax credits for donations to organizations that provide scholarships for students to attend private schools, including religious schools. *Arizona Christian School Tuition Organization v. Winn*, —— U.S. ——, 131 S.Ct. 1436, 179 L.Ed.2d 523 (2011).[9]

By indicating that taxpayers may not have standing to present a constitutional challenge to the spending of state resources through tax credits—regardless of whether the tax credit is transferable—the

---

8. *See also,* Missouri Tax Credit Review Commission, *A Report of the Missouri Tax Credit Review Commission,* at 5 (Nov. 30, 2010), *available at* http://tcrc.mo.gov/pdf/TCRCFinal Report113010.pdf (stating that "The Governor charged the Commission to determine which tax programs were generating a good return on investment for the taxpayers of Missouri and which were not . . .")

9. The difference between standing in state courts and the federal Article III standing doctrine is illustrated by the fact that the Arizona taxpayers previously had challenged the school tuition tax credits in Arizona state courts and had lost on the merits—the state plaintiffs had "standing" in state court. *Winn,* 131 S.Ct. at 1440.

principal opinion provides the legislature with a roadmap to try to ensure that courts never will be able to review whether any grant of public money as a tax credit violates a specific prohibition in the Missouri Constitution.

The principal opinion brings to mind a familiar 19th century observation that the American republic will endure until politicians realize they can bribe the people with their own money.[10] This observation usually is applied to social insurance and other entitlements from state and federal governments and these forms of welfare generate no shortage of commentary predicting the end of the republic.

The genius of those who enact transferable tax credit programs is that tax credits allow governments to bestow financial largess on well-connected recipients with little or no public scrutiny and—with this Court's indulgence—no judicial scrutiny.

Are these transferable tax credits public money? If it looks like money and acts like money, it is money. And, because it comes from the state of Missouri, it is *public* money. And because it is public money, the taxpayers here, Manzara and Marquard, have standing to bring this lawsuit.

The denial of standing to taxpayers who challenge tax credit spending rests on a flawed economic and legal analysis—an analysis sure to be noted by future historians tracing the origins of the congenial corruption that led to widespread distrust of government and ultimately to its demise. It may not be the end of our republic, but perhaps we may be able to see the end from here.

## Missouri's Law of Standing

Missouri courts—unlike the federal courts—have a long history of allowing taxpayers *as taxpayers* to bring challenges to the use of public funds that are claimed to be unlawful or unconstitutional. *Newmeyer v. Missouri & Mississippi Railroad,* 52 Mo. 81 (1873). "Missouri courts allow taxpayer standing so that ordinary citizens have the ability to make their government officials conform to the dictates of the law when spending public money." *Ste. Genevieve Sch. Dist. R–II v. Bd. of Aldermen of City of Ste. Genevieve,* 66 S.W.3d 6, 11 (Mo. banc 2002) (citing *State ex rel. Nixon v. Am. Tobacco Co., Inc.,* 34 S.W.3d 122, 133 (Mo. banc 2000)). "A taxpayer has standing to challenge an alleged illegal expenditure of public funds, absent fraud or compelling circumstances, if the taxpayer can show either a direct expenditure of funds generated through taxation, an increased levy in taxes, or a pecuniary loss attributable to the challenged transaction of a municipality." *Id.* at 10 (citing *E. Mo. Laborers Dist. Council v. St. Louis County,* 781 S.W.2d 43, 47 (Mo. banc 1989)). It is irrelevant that the challenged expenditure may "produce a net gain.... Taxpayers must have some mechanism of enforcing the law." *E. Mo. Laborers,* 781 S.W.2d at 47. *See also Tichenor v. Mo. State Lottery Comm'n,* 742 S.W.2d 170, 172 (Mo. banc 1988) (allowing a taxpayer to challenge the state lottery commission's decision to use commission funds to participate in a multistate lottery).

The principal opinion resorts to the dictionary definitions of the words "direct expenditure of funds generated through taxation." Piecing together individual def-

---

**10.** This observation is sometimes attributed to Alexis de Tocqueville, a 19th century Frenchman whose DEMOCRACY IN AMERICA is often cited but not often read. It is a clever observation but it is hard to find that de Tocqueville said it, though he was a fount of observations about American character and governance.

initions, the majority comes up with the following definition: "a sum paid out, without any intervening agency or step, of money or other liquid assets that come into existence through the means by which the state obtains the revenue required for its activities." But by parsing these definitions, the majority cobbles together a definition of the phrase that seems to support the proposition that transferable tax credits are direct expenditures of the state's liquid assets—money that is due in taxes. This shows that if you are looking for meaning, the dictionary is not necessarily the place to go, especially if the definition you piece together defies common sense.

### Distorting Precedent

To get to its result that taxpayers do not have standing to challenge the grant of transferable tax credits, the principal opinion has to distort *Curchin* and ignore other cases.

In *Curchin*—a case that is right on point—this Court flatly held that a "tax credit is as much a grant of public money or property and is as much a drain on the state's coffers as would be an outright payment by the state to the bondholder upon default." 722 S.W.2d at 933. The statute in *Curchin* authorized the industrial development board to issue industrial revenue bonds to promote development. *Id.* at 931. The board also was authorized to include a provision in these bonds for "a state tax credit for the amount of any unpaid principal and accrued interest in default." *Id.* The Court was asked to consider whether these tax credits were an improper public expenditure under article III, section 38(a) of the Missouri Constitution. *Id.* at 932. The board argued that because no payment was required by the state, no "grant of public money" occurred. *Id.* at 933. The Court disagreed and held

that "[t]here is no difference between the state granting a tax credit and foregoing the collection of the tax and the state making an outright payment to the bondholder from revenues already collected." *Id.* at 933. The Court reasoned that the tax credit was available to the original bondholder and subsequent bondholders. *Id.* If the bondholder did not have sufficient state tax liability to take advantage of the credit, he or she was allowed to sell the bond to someone who could use the credit. *Id.* Finally, the Court noted that the tax credit could be carried forward for 10 years. *Id.* The Court concluded, "The transferability of the bonds, the availability of the tax credit to subsequent bondholders, the issuance of the bonds to failing or risky businesses, and the ten-year carry forward provision make the utilization of the tax credit a near certainty." *Id.*

In this case, the $28 million in tax credits authorized to Northside Regeneration under section 99.1205 affect the plaintiff taxpayers in the same way that a decision by the legislature to provide $28 million straight out of the state's coffers would affect them. Just as in *Curchin*, the tax credits here are transferable—by sale or assignment—and can be carried forward a number of years. Just as the issuance of the tax credits to failing or risky businesses contributed to the Court's finding that their use was "a near certainty," here, the fact that the tax credits are only issued after several very specific requirements are met, including the creation of a redevelopment agreement with a municipal authority, section 99.1205.2(15), shows that "[t]here is no difference between the state granting a tax credit and foregoing the collection of the tax and the state making an outright payment." *Curchin*, 722 S.W.2d at 933.

The principal opinion asserts that the money Northside Regeneration received is

not the state's money because it had not actually *reached* the state's coffers, but, again, its conclusion is not supported by our cases. In *Ste. Genevieve Sch. Dist.*, 66 S.W.3d at 6,[11] the Court looked at whether an individual taxpayer and a school district could challenge an abatement of property taxes in a tax increment financing (TIF) district. The defendant city had amended a redevelopment project without convening the TIF commission. *Id.* at 9. The amendments to the project provided for certain property owners in the TIF district to have any increases in their property taxes abated through the use of TIF revenues. *Id.* at 11. The Court held that the school district had standing because the abatement of taxes would deprive the school district of tax funds that it otherwise would have received, resulting in a pecuniary loss. *Id.* The Court also reasoned that the taxpayer had standing because the redevelopment project "costs the school district and the city future tax revenue." *Id.* In a similar fashion, the tax credits issued to Northside Regeneration will result in the loss of future tax revenue to the state of Missouri.

The principal opinion argues that the taxpayers do not have standing in this case under the rationale of *W.R. Grace & Co. v. Hughlett*, 729 S.W.2d 203 (Mo. banc 1987), but misconstrues what the Court held. The plaintiff, W.R. Grace, brought suit against the Jasper County collector of revenue, challenging the "manufacturers tax" that it had been required to pay based on annual assessments for certain tax years under section 150.310.1, RSMo 1978. *Id.* at 204. Grace argued that the manufacturing tax being imposed violated the Missouri Constitution, article X, section 3 (1945), the uniformity clause, which provid-

ed that taxes "be uniform upon the same class of subjects" and the equal protection clause of the Fourteenth Amendment. *Id.* at 204–05, 205 n. 3. Grace argued that the uniformity clause was violated because the authorizing of exemptions for certain types of tangible personal property resulted in a lack of tax uniformity. *Id.* at 204–05. It also argued that these exemptions violated the equal protection clause because article X, section 6 (1945, amended 1972), provided that only the property tax exemptions specifically enumerated in section 6 could be exempted from taxation. *Id.* at 204–05 & 204 n. 2. Grace sought a refund of the taxes that it had paid under section 150.310.1 due to the fact that other taxpayers had received these allegedly unconstitutional exemptions. *Id.* at 205. As the principal opinion here correctly notes, the Court found that W.R. Grace did not have standing because it was not "*'adversely affected by the statute[s] in question'*" because "those statutes would merely excuse the tax obligations of others." *Id.* at 206–07 (quoting *Ryder v. County of St. Charles*, 552 S.W.2d 705, 707 (Mo. banc 1977)) (emphasis and brackets in original). While the principal opinion focuses on this single line from the Court's decision, it is the Court's entire explanation as to why W.R. Grace did not have standing that is important here.

The Court reasoned that "it assumes too much to say [W.R. Grace] has standing to raise the uniformity clause and fourteenth amendment challenges to an otherwise facially valid taxing statute because certain alleged unconstitutional exemptions may have been conferred by non-related statutes upon classes of taxpayers other than [W.R. Grace]." *W.R. Grace & Co.*, 729 S.W.2d at 206. The Court further noted

11. The principal opinion's attempts to distinguish this case show that it is, in fact, indistin- guishable.

that "[i]f we were to assume, while not deciding, that the statutes relied upon by [W.R. Grace] did in fact create unconstitutional exemptions, it does not follow that this would entitle [W.R. Grace] to a refund of the monies paid under a *different and totally unrelated taxing statute.*" *Id.* at 207 (emphasis added). *W.R. Grace*'s analysis is not applicable here because W.R. Grace was not challenging the expenditure of public money but rather the government's failure to collect taxes from other entities. The challenge of expenditures is necessarily a separate analysis, and *W.R. Grace*'s holding is irrelevant.

The principal opinion's conclusion that the transferable tax credits in this case are not payments directly from the treasury is undercut by the definition of "total state revenue" in the tax-limiting Hancock Amendment. That definition, in article X, section 17(1), supports the proposition that the tax credits in this case are part of "total state revenue," because such revenues "shall include the amount of any credits not related to actual tax liabilities." That portion of the definition of "total state revenue" applies to the transferable tax credits at issue in this case—which are granted to Northside Regeneration and are not related to its tax liabilities. The argument of plaintiffs in *Mo. Merchs. & Mfrs. Ass'n v. State,* 42 S.W.3d 628 (Mo. banc 2001), that tax credits should be included in total state revenue failed because the plaintiffs took an all-or-nothing approach to tax credits and the record did not support differentiating among various categories of tax credits. *Id.* at 635–36. The taxpayers in *Mo. Merchs.* did not dispute the trial court's conclusion that there was no evidence as to which tax credits should be included in total state revenue; this Court, accordingly, remanded the case to the trial court to determine whether there were in fact tax credits not related to tax liabilities. *Id.*

The *Mo. Merchs.* opinion notes the strange fact that moneys paid from the treasury also are counted as "revenues." "It may seem strange that a payment from the treasury is counted as 'revenue,' but that is precisely what article X, section 17(1) requires when it says that tax credits 'not related to actual tax liabilities' shall be included in 'total state revenues.'" *Id.* at 635–36. The purpose of that provision "is to ensure that any amounts of tax credits that exceed tax liabilities, and result in payments from the treasury, will not result in a deduction in the amount of 'total state revenues' for the purposes of computing the Hancock limit." *Id.* at 636. If the Hancock Amendment counts these kinds of tax credits as state revenue, it makes no sense to say that the transferable tax credits in this case—which are "not related to actual tax liabilities"—are not public funds. They are public funds and taxpayers have standing to challenge their expenditure.

### *Arizona Christian School Tuition Organization v. Winn*

The most troubling aspect of the principal opinion is its injection into Missouri standing analysis of the United States Supreme Court's recent decision in *Arizona Christian Sch. Tuition Org. v. Winn,* —— U.S. ——, 131 S.Ct. 1436, 179 L.Ed.2d 523 (2011). The Supreme Court's decision in *Winn,* however, is guided by federal court standing principles—principles that are quite different from those principles under which Missouri courts recognize taxpayer standing, a difference that reflects the vastly different roles of state and federal courts.

The United States Supreme Court applies its doctrine under Article III of the United States Constitution, requiring plaintiffs challenging governmental action to show that they have suffered or will

suffer (1) an " 'injury in fact;' " (2) " 'a causal connection between the injury and the conduct complained of;' " and (3) that it is " 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.' " *Id.* at 1442 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). *See also, Massachusetts v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923).[12] In other words, to show standing under Article III, a taxpayer would have to show that the taxpayer has suffered an "injury" that is individual to him or her and not merely the generalized injury that may have been suffered by the public at large.

The United States Supreme Court has recognized exceptions for taxpayer plaintiff only in a narrow range of cases involving challenges based on the establishment clause of the First Amendment, as in *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). *Winn,* 131 S.Ct. at 1445. Though discussing *Flast, Winn* leaves undisturbed the recent doubt that taxpayer standing will be recognized even in many religion cases. *See, e.g., Hein v. Freedom From Religion Found., Inc.,* 551 U.S. 587, 127 S.Ct. 2553, 168 L.Ed.2d 424 (2007). This trend, of course, may leave the enforcement of the separation of church and state to the states under their state constitutions, where such matters resided until the last 70 years or so. *See, e.g., Harfst v. Hoegen,* 349 Mo. 808, 163 S.W.2d 609, 611–12 (1941).

More to the point, however, is the fundamental difference between the role of state courts in enforcing specific provisions of a state constitution and the role of the federal courts enforcing federal constitutional constraints against states. In *Winn,* as noted, the challenge to the tax credits for tuition for religious schools first was presented to the state courts, and the taxpayer-plaintiffs lost on the merits. 131 S.Ct. at 1441 (citing *Kotterman v. Killian,* 193 Ariz. 273, 972 P.2d 606 (1999)). There unquestionably was taxpayer standing in state court, and the Arizona courts met the challenge head-on without even mentioning standing.

By adhering to its Article III standing requirements, on the other hand, the United States Supreme Court stays out of controversies that state courts have a duty to adjudicate under their constitutions, as the Arizona court did in *Kotterman.* The truly relevant cases, for our standing purposes, start with this Court's explicit holdings on standing in *Tichenor,* 742 S.W.2d at 172, and *E. Mo. Laborers Dist.,* 781 S.W.2d at 47, and continue through *Ste. Genevieve Sch. Dist. R–II,* 66 S.W.3d at 11, all of which recognize the standing of taxpayers permitted to sue as taxpayers without showing the kind of particularized "injury in fact" that the United States Supreme Court requires under Article III. The significance of these modern Missouri cases is that they explain the taxpayer standing doctrine that has been assumed throughout much of our state's history. *See* Thomas C. Albus, *Taxpayer Standing in Missouri,* 54 J. Mo. Bar 199 (1998).

The difference between the United States Supreme Court and the Supreme

---

**12.** There is a vibrant debate—if debates on the history of standing can be characterized as vibrant—as to whether liberal justices invented or developed the law of standing to insulate New Deal agencies and progressive legislation from judicial scrutiny by a conservative Supreme Court. *See,* Daniel E. Ho & Erica L. Ross, *Did Liberal Justices Invent the Standing Doctrine? An Empirical Study of the Evolution of Standing 1921–2006,* 62 STANFORD L.REV. 591 (2010); F. Andrew Hessick, *Standing, Injury in Fact, and Private Rights,* 93 CORNELL L.REV. 275 (2008); Robert J. Pushaw, Jr., *Justiciability and Separation of Powers: A Neo–Federalist Approach,* 81 CORNELL L.REV. 393 (1996).

Court of Missouri is important—Missouri recognizes a taxpayer's standing even though his injury may be no different from that of other taxpayers, and the United States Supreme Court does not. The differences in taxpayer standing cases reflect the profound differences between the constitutions under which these courts function. State constitutions "do not reflect the same level of trust in state legislative decisionmaking as does the federal Constitution in congressional decisionmaking." Helen Hershkoff, *State Courts and the "Passive Virtues:" Rethinking the Judicial Function,* 114 HARV. L.REV. 1833, 1891–92 (2001). "Article I of the Constitution assumes that Congress is best situated to decide how to carry out the terms of its authority. . . . State constitutions, in contrast, *impose not only substantive, but also procedural requirements on legislative activity.*" *Id.* at 1892. "[S]uch provisions alter the dynamics of lawmaking, implicating the state courts in the resolution of certain governance questions that are largely outside the Article III experience." *Id.* at 1893.

The principal opinion's analysis may allow the legislature to circumvent not just article III, section 38(a) but many other requirements of the Missouri Constitution, evading what this Court said in *E. Mo. Laborers Dist. Council* about the need for "a system of checks and balances whereby taxpayers can hold public officials accountable for their acts." 781 S.W.2d at 47.

While the choices of how to spend the public's money are choices that the elected political branches of our government get to make, the state courts have a duty to guard the state constitution and to intervene at the behest of an aggrieved taxpayer when the state's resources are being spent on matters that the constitution forbids or on projects that have no public purpose.[13]

The principal opinion suggests that the remedy lies in the political process, but there is little doubt that the $500 million currently being spent on public projects to create jobs, make movies,[14] and do other useful things—instead of fully funding the needs of public education, for instance—might well receive majority support. But constitutional constraints may serve occasionally to restrain the current generation from robbing the next generation, a function that is not fulfilled by democratic majorities unless, perhaps, the voting age can be lowered to age 8.

The principal opinion in this case, I am sad to say, follows the irrelevant lead of the United States Supreme Court and, in doing so, may lead the Court in future cases to forsake its duty under the Missouri Constitution. The United States Supreme Court can assume that money is not public until it is deposited in the treasury

---

**13.** "The primary basis for taxpayer suits arises from the need to ensure that government officials conform to the law. It rests upon the indispensable need to keep public corporations, their officers, agents and servants strictly within the limits of their obligations and faithful to the service of the citizens and taxpayers." *E. Mo. Laborers Dist. Council,* 781 S.W.2d at 46 (internal citations omitted).

**14.** Two excellent movies made in Missouri with public support both were nominated for Academy Awards for Best Picture: "Winter's Bone," (2011 nominee) ($800,000 in state support through tax credits) which depicts poorly educated methamphetamine addicts and murderers in Southwest Missouri, and "Up in the Air," (2010 nominee) ($5.1 million in state support), a story of a man played by actor George Clooney who is hired to fly around the country firing employees of companies that are downsizing. The stories of these movies seem to show that this governmental program did not suffer from irony deficiency.

and thereby find that a taxpayer suffers no direct "injury in fact" sufficient to support Article III standing. The Supreme Court's standing decisions reflect its reticence to redirect taxation and spending by applying the constitutional principles of due process and equal protection under the Fourteenth Amendment.

The reluctance of the United States Supreme Court to interfere with state decisions is prudent and respectful of federalism, but in state supreme courts, there are no federalism concerns. When a state supreme court closes the courthouse doors to challenges based on specific provisions of a state constitution, the Court is not acting prudently—its failure is a dereliction of duty, permitting state officials to spend the public's money indirectly through tax credits where they would be forbidden to spend the public's money directly.

Thereby relieved of constitutional accountability by the principal opinion in this case, elected officials can feel free to use state government as an ATM for dispensing public money through tax credits for special projects and to special pleaders. Without judicial review, an important purpose of our state constitution—to safeguard the public's resources for the benefit of future generations—will be entirely dependent on elected officials who may depend on the beneficiaries of tax credits for the financial support their campaigns need. Are these elected officials cognizant of the needs of future generations? Yes, of course, as they often express devotion if not actual money to those needs. Are they dependent today on the well-being of future generations? Not so much.

The Arizona Supreme Court decided the merits of the controversy over the funding of parochial school children's education with tax credit funds, without, as noted, even mentioning whether the taxpayers had standing to sue. *Kotterman,* 972 P.2d at 606.[15] Regardless of whether an Arizonan agreed or disagreed with the court's resolution of the controversy, the Arizona taxpayers received what they had a right to receive from their courts—a resolution of a constitutional conflict over state spending, which is what Missouri taxpayers traditionally expect when they seek redress as taxpayers in our state courts. When the United States Supreme Court denies standing in a controversy involving the spending of state money, it can be seen as a prudent respect for state prerogatives in a federal system. But when state courts deny standing and refuse to reach the merits of a constitutional challenge to state spending, the constitutional controversy remains unresolved, with the consequence that a segment of our society may be marginalized because the merits of its side of a legal controversy never are addressed, and the unresolved controversy can continue to fester and build resentment. Hence the importance of getting to the merits and treating the taxpayers' grievances with the respect they are due.

## Public Purpose

The merits, however, do not favor these taxpayers. Even though I would hold that the tax credits here are a grant of public money, I believe that, under our cases, money for the redevelopment of an economically-disadvantaged area is for a

---

**15.** The Arizona decision was based on the First Amendment to the United States Constitution; in Missouri—which has specific prohibitions dating from the 1870s—the state constitution is likely to be the source of the law. *See, e.g., Harfst,* 163 S.W.2d at 612–614 (discussing specific Missouri provisions). For standing purposes, the source of law is unimportant. If a taxpayer as taxpayer has standing, as in both Arizona and Missouri, he or she has standing regardless of the law on which the claim is based.

"public purpose" and, therefore, is constitutional.

This Court has held that even if a grant of public money or property occurs, there is no violation of article III, section 38(a) if the grant serves a public purpose, even though "public purpose" is not mentioned in this constitutional provision. *See, e.g., Fust*, 947 S.W.2d at 429; *Menorah Med. Ctr.*, 584 S.W.2d at 79.

Judicial decisions reviewing "public purposes" have not been robust, to say the least. The decision of what constitutes a public purpose is primarily left to the legislature. *Fust*, 947 S.W.2d at 430. This Court will not overturn the legislature's determination unless it is arbitrary and unreasonable. *Id.* So long as "the primary purpose of a statute is public 'the fact that special benefits may accrue to some private persons does not deprive the government action of its public character, such benefits being incidental to the primary purpose.'" *State ex rel. Wagner v. St. Louis County Port Auth.*, 604 S.W.2d 592, 597 (Mo. banc 1980).

On its face, the purpose of the tax credit in this case is to encourage and assist in redeveloping land in areas deemed distressed under both federal and Missouri law. Section 99.1205 states that it is to be known and cited as the "Distressed Areas Land Assemblage Tax Credit Act." Section 99.1205.1. Section 99.1205.2(8)(b) requires that "[a]t least eighty percent of the eligible project area shall be located within a Missouri qualified census tract area[16] ... or within a distressed community as that

term is defined in section 135.530." Certain criteria must be met before an applicant is eligible for a tax credit under section 99.1205. These requirements include that the land be redeveloped within an "eligible project area" and be redeveloped in accordance with a redevelopment agreement approved by a municipality under an economic incentive law. Section 99.1205. The statute also specifies the amount and use of the tax credits and requires that "funds generated through the use or sale of the tax credits ... shall be used to redevelop the eligible project area." Sections 99.1205.2(2)(b)a; 99.1205.3.

This Court previously has said that "[r]edevelopment of 'blighted, substandard or insanitary' areas is a public purpose." *Tierney v. Planned Industrial Expansion Auth. of Kansas City*, 742 S.W.2d 146, 150 (Mo. banc 1987). *See also State ex rel. U.S. Steel v. Koehr*, 811 S.W.2d 385, 389 (Mo. banc 1991) ("[T]he clearing and redevelopment of a blighted area is for the public use of revitalizing such area to make it healthful."); Mo. CONST. art. VI, § 21 ("Laws may be enacted, and any city or county operating under a constitutional charter may enact ordinances, providing for the clearance, replanning, reconstruction, redevelopment and rehabilitation of blighted, substandard or insanitary areas ...").

Nevertheless, Manzara and Marquard argue that the purpose of the statute is not a public use, but rather that it is designed "to promote some private end." *See State*

---

**16.** The statute provides that a Missouri qualified census tract is "designated by the United States Department of Housing and Urban Development under 26 U.S.C. Section 42." Section 99.1205.2(8)(b). 26 U.S.C. section 42(d)(5)(B)(ii) defines a qualified census tract as

any census tract which is designated by the Secretary of Housing and Urban Develop-

ment and, for the most recent year for which census data are available on household income in such tract, either in which 50 percent or more of the households have an income which is less than 60 percent of the area median gross income for such year or which has a poverty rate of at least 25 percent....

*ex rel. City of Jefferson v. Smith,* 348 Mo. 554, 154 S.W.2d 101, 102 (1941). In analyzing article VI, section 23 and article III, section 38, courts have given further guidance as to what constitutes a public interest.[17] A statute serves a public purpose if the primary effect of that statute is to promote a public interest. *Curchin,* 722 S.W.2d at 930. *See also Rice v. Ashcroft,* 831 S.W.2d 206, 209 (Mo.App.1991). Conversely, a statute serves a private interest if it primarily promotes a private interest, regardless of whether there is an incidental benefit to the public. *Curchin,* 722 S.W.2d at 930; *Rice,* 831 S.W.2d at 209. Simply because a private individual or entity benefits from the statute does not negate its public purpose. It is only if the primary purpose was to benefit an individual that the statute is for private use.

The taxpayers in this case have not negated the state's position that the primary purpose of the statute is to promote redevelopment of distressed communities. The benefit to the redeveloper of the distressed communities is considered incidental unless the taxpayer shows otherwise. *Rice,* 831 S.W.2d at 209 (holding that lease payments by Missouri, St. Louis city, and St. Louis County to the regional sport authority were for the primary public purpose of increasing sporting and convention business in St. Louis despite an "incidental" benefit to the St. Louis NFL corporation). *See also Moschenross v. St. Louis County,* 188 S.W.3d 13, 22 (Mo.App.2006) (holding that St. Louis city's financing of the construction of a ballpark on behalf of Cardinals Ballpark L.L.C. did not primarily benefit the Cardinals Ballpark L.L.C. and

instead it was for the primary public purpose of increasing tax revenue). Under these cases, the tax credits granted under this statute appear to serve a public purpose.

Manzara and Marquard note that the predecessor to article III, section 38(a) was enacted to prevent the state from continuing its custom of giving large sums of money to railroads, canals and banks on a regular basis and abusing its power in doing so. *Curchin,* 722 S.W.2d at 934 (citing 11 Debates of the Missouri Constitution 1945, 3212 (debate of May 23, 1944) (statement of Mr. Garten)). In *Curchin,* the Court relied on this history and found that there was no public purpose where the Industrial Development Board was able to give out state tax credits to companies that had defaulted on their industrial revenue bonds. *Id.* at 935. Using tax credits to bail out private companies that defaulted on their bonds obviously fails the public purpose test.

The tax credits in this case are explicitly tied to the developer's agreement with a municipality to develop a blighted or distressed neighborhood. There is no *carte blanche* grant of tax credits for any purpose, as in *Curchin,* but instead there are assurances that only developers furthering the purpose of section 99.1205 will obtain the tax credits.

Manzara and Marquard may disagree with the legislature's decisions to create a tax credit and to implement the tax credit in the manner that it did. But they have not met their burden of showing that sec-

---

**17.** Article VI, section 23 says: "No county, city or other political corporation or subdivision of the state shall own or subscribe for stock in any corporation or association, or lend its credit or grant public money or thing of value to or in aid of any corporation, association or individual, except as provided in this constitution." Both article VI, section 23 and article III, section 38 forbid a grant of public money to a private entity. The article VI provision prevents a county, city or other public corporation or subdivisions from doing so whereas the article III provision prevents the legislature from doing so.

tion 99.1205 is not directed toward a public purpose.

There is, however, a strong case to be made that the Court one day should revisit the question of what is a "public purpose," and whether it is properly a qualification for approving public spending under Article III, section 38(a). Courts may not be perceived as doing their duty to the public when they show extraordinary deference to the legislature.[18] The current standard for determining that spending is for a "public purpose" is so lax that it is difficult to imagine an expenditure of public funds, aside from the expenditure authorized in *Curchin*, that would not be considered for a "public purpose" if the government says that it is.

### Conclusion

I concur in the result, but I disagree with the principal opinion's conclusion that the taxpayers, Manzara and Marquard, failed to show that they have standing to sue. I think it is both unnecessary and unwise to engage in a muddled discussion of standing when the use of tax credits in the redevelopment of north St. Louis can be justified as being for a "public purpose." Although I have doubts about the reliance on "public purpose" to justify challenges under Article III, section 38(a) to the granting of public funds to a private entity, that is the current law and it suffices to justify the expenditures under the

Distressed Land Assemblage Act that the taxpayers challenge in this case.

LAURA DENVIR STITH, Judge, concurring.

I concur in the analysis of the majority opinion that the plaintiffs do not have standing under current Missouri law regarding taxpayer standing, under which "[a] taxpayer has standing to challenge an alleged illegal expenditure of public funds, absent fraud or compelling circumstances, if the taxpayer can show either a direct expenditure of funds generated through taxation, an increased levy in taxes, or a pecuniary loss attributable to the challenged transaction of a municipality." *Ste. Genevieve Sch. Dist. R–II v. Bd. of Aldermen of City of Ste. Genevieve*, 66 S.W.3d 6, 10 (Mo. banc 2002) (citing *E. Mo. Laborers Dist. Council v. St. Louis County*, 781 S.W.2d 43, 47 (Mo. banc 1989)). I also concur that this is not the case in which to consider whether that test should be modified. Neither of the parties has requested or briefed such a modification, appellate courts are not advocates and, generally, issues not raised by the parties will not be addressed. *See Kline v. City of Kansas City*, 334 S.W.3d 632, 640 (Mo.App.2011).

Nonetheless, because of the importance of this issue, were this issue dispositive I would be in favor of asking for supplemental briefing about whether a different test should be applied in light of the fact that the Court's rules for taxpayer standing

---

**18.** In another context, much of the criticism of the United States Supreme Court's decision in *Kelo v. City of New London*, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005) resulted from the Court's deference to the legislative judgment that private property taken by eminent domain was for a "public purpose." Daniel B. Kelly, *The "Public Use" Requirement in Eminent Domain Law: A Rationale Based on Secret Purchases and Private Influence*, 92 Cornell L.Rev. 1 (2006); *Eric Rutkow, Kelo v. City of New London*, 30 Harv.

Envtl. L.Rev. 261, 268–70 (2006), and Ashley J. Fuhrmeister, *In the Name of Economic Development: Reviving "Public Use" as a Limitation on the Eminent Domain Power in the Wake of Kelo v. City of New London*, 54 Drake L.Rev. 171, 177 (2005). In the case of eminent domain, the Missouri Constitution—in contrast to the United States Constitution—specifically instructs Missouri courts not to defer to the legislative judgment that a taking is for a public purpose. Article I, section 29.

were established without consideration of tax credits and that strong arguments can be made that the taxpayer standing test should be expanded to allow a taxpayer to challenge an illegal tax credit because the policy for allowing taxpayer standing would be the same for tax credits as it is for direct expenditures of public funds generated through taxation.

I agree with Judge Wolff, however, that the tax credits at issue here constitute an expenditure of public funds for a public purpose and, therefore, are valid. Accordingly, there is no reason to require additional briefing and argument in this case, for the result would be the same regardless whether this Court were to modify the test for taxpayer standing.

For these reasons, I concur in the majority opinion and in the portion of the concurring opinion of Judge Wolff that concludes that the tax credits constitute a valid expenditure of public funds for a public purpose.